1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| RICHARD CHARLES BUCHANAN,<br><br>                              Petitioner,<br><br>         vs.<br><br>MATTHEW CATE,<br><br>                          Respondent. | Civil No.        10-0423 BTM (NLS)<br><br>**REPORT AND RECOMMENDATION RE:**<br><br>**(1) DENIAL OF REQUEST FOR EVIDENTIARY HEARING; and**<br><br>**(2)  DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS** |

16
17

**I.      INTRODUCTION**

18              Petitioner Richard Charles Buchanan, a state prisoner proceeding pro se, has filed a First

19    Amended Petition for Writ of Habeas Corpus (Pet.) pursuant to 28 U.S.C. § 2254, challenging his

20    convictions in San Diego County Superior Court case number SCS187166 for kidnaping for ransom or

21    extortion, assault with a semi-automatic firearm, making a criminal threat, possession of a firearm by

22    a felon, transportation of a controlled substance, possession of a controlled substance for sale, and

23    possession of a controlled substance.  (Pet. at 6-16, ECF No. 40; Attach. C, ECF No. 40-1; Mem. of P.

24    & A. Supp. Pet., ECF No. 40-2; Lodgment No. 23, vol. 3 at 0725.02-07.)[1]  As to the kidnaping, assault

25    with a firearm and criminal threat charges, the jury found true an allegation that the crimes were

26    committed for the benefit of a criminal street gang.  (Lodgment No. 23, vol. 3 at 0725.05-07.)  The jury

27
28              [1]  For ease of reference, the Court will use the page numbers assigned by the Court's electronic filing
system.

1   also found Buchanan personally used a firearm during the commission of the kidnaping.  (*Id.* at

2   0725.07.)  Following the trial, the trial court found Buchanan had suffered three prior convictions which

3   were serious or violent felonies and which also constituted "strikes" under California's Three Strikes

4   law.  (Lodgment No. 25, vol. 11 at 1604-21.)  The petition presents eleven claims.  (*See* Pet. at 6-16,

5   ECF No. 40; Attach. C, ECF No. 40-1; Mem. of P. & A. Supp. Pet., ECF No. 40-2.)  Buchanan also asks

6   for an evidentiary hearing.  (*See* Pet. at 1, ECF No. 40; Traverse at 33, ECF No. 77; Req. for Evid. Hrg,

7   ECF No. 99.)

8       This case is before the undersigned Magistrate Judge pursuant to S.D. Cal. Civ. R. 72.1(d)(4)

9   for Proposed Findings of Fact and Recommendation for Disposition.  For the reasons set forth below,

10   the Court respectfully recommends that both Petitioner's request for an evidentiary hearing and the

11   Petition be **DENIED**.

12   **II.    FACTUAL BACKGROUND**

13       This Court gives deference to state court findings of fact and presumes them to be correct;

14   Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence.  28

15   U.S.C. § 2254(e)(1) (West 2006); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992) (holding findings

16   of historical fact, including inferences properly drawn from these facts, are entitled to statutory

17   presumption of correctness).  The following facts are taken from the California Court of Appeal's

18   opinion denying Buchanan's direct appeal of his convictions.

19
20       During the summer of 2003, the San Diego Violent Crimes Task Force began an investigation of the Mexican Mafia, an Hispanic prison gang, and its operations in and out of California Prisons.  In July 2004 a cooperating witness with the FBI gave Buchanan a cell phone with a wiretap on it.  Buchanan was validated by the California Department of Corrections and Rehabilitation in 1989 as a member of the Mexican Mafia.  A common name for a member of the Mexican Mafia, such as Buchanan, is a "Big Homie."

21
22

23       Another cell phone with a wiretap on it was given to Rodney Brooks, who was an inmate at R.J. Donovan State Prison (Donovan) and an associate of the Mexican Mafia in a supervisorial role.

24

25       Jessica Chavez was a correctional officer at Donovan who was assigned to housing unit 1.  Ernesto "Triste" Torres was an inmate who was housed in the Enhanced Outpatient Unit (EOP) of housing unit 1; most of the EOP inmates were classified as mentally ill.  Chavez had daily contact with Torres while he was in the day room, and a friendship developed.  When a Mexican Mafia "soldier" put a "hit" on Chavez, Torres arranged to have the "hit" neutralized; as a result, he and Chavez became closer.  Chavez gave Torres her cell phone number in order to set up a meeting after he was released.

26
27
28

On May 15, 2004, Torres was released from prison and called Chavez. After spending the day together, they had sex that evening at her residence. For the following month, Chavez and Torres saw each other on a regular basis. However, when Chavez noticed changes in Torres's behavior and tried to distance herself from him, he threatened to expose their relationship to prison officials, which he said would result in her job termination and the removal of her children.

Meanwhile, Chavez started to have conversations at work with inmate Brooks, who knew Torres. Chavez told Brooks she was experiencing undue stress from her relationship with Torres and was considering transferring to another prison. Brooks replied he would call Torres; Chavez gave Brooks the telephone number of Torres's brother.

On August 21 Brooks telephoned Buchanan; the call was recorded by the task force investigating the Mexican Mafia. Brooks told Buchanan he had a "connection" at Donovan that helped him with business in the prison and she was considering transferring to another institution because "Triste" was threatening her and her children. [footnote 3: Chavez did not know Brooks planned to use her as a connection inside the prison and, up to that time, had not assisted the Mexican Mafia]. Brooks gave Buchanan the telephone number to reach Torres, but asked permission to call Torres first to assess Torres's attitude and reaction before Buchanan called him and "got at him." Buchanan gave Brooks permission to call Torres.

Brooks called Torres on Chavez's behalf and told him to stay away from her. Torres, however, continued to see Chavez.

On August 22 Brooks called Buchanan and told him that although Torres said he no longer would bother Chavez, he was "disrespecting" them because he "turned around and banged on her ass again," telling her he was a " 'rider for life.' " Later that day, Brooks set up a three-way phone call between himself, Torres and Buchanan. After Torres answered, Brooks told him: "Like I told you the other day, I talked to the homie and he told me to let you know personally, just . . . don't get at her, dog. Don't threaten her, her kids, none of that shit, homie. You know what I mean?" Torres said he understood. Buchanan identified himself as "Richie, the big homie," and told Torres to leave Chavez alone and to respect the fact that she was "there and it's there for a purpose . . . something that was worked out by other people." Torres indicated he would leave Chavez alone.

On the morning of August 25, Brooks called Buchanan and told him Torres was continuing to threaten Chavez. Chavez was present and she gave Buchanan the pass code to her phone message machine so he could listen to a threatening message Torres left her on the machine. Chavez also gave Torres's phone number to Buchanan. Buchanan said he would "get on that right now."

Later that day, Chavez called Buchanan on her cell phone. Torres was on her house phone, and she wanted Buchanan to hear what Torres was saying to her. However, Buchanan could not hear what Torres was saying. Buchanan told Chavez to hang up on Torres and asked if he could come to her residence. Chavez gave Buchanan her address. Buchanan said he would go to Home Avenue to pick up somebody first.

Buchanan arrived at Chavez's house with Parraz. When Torres called Chavez's cell phone, she gave it to Buchanan, who told Torres: "This is the Big Homie. Man to man I want to talk to you." Torres gave Buchanan his brother's address.

///

When Buchanan and Parraz arrived at the residence of Torres's brother, Torres walked out to greet them. The three of them went inside and sat at the dining room table. Buchanan told Torres to leave Chavez alone and asked him if he knew what happened if a person gave his word to the Big Homie and did not keep it. Torres testified Parraz walked around the table "flashing a gun that he had in his right pocket, and said: " 'If your family wasn't here, I'd smoke you.' " Parraz flashed the gun six or seven times. Torres's brother and his family were upstairs during most of the discussion. At one point, Torres's brother Leobardo came downstairs, and Parraz told him Torres " 'really messed up,' " but that they were not going to " 'disrespect' " Leobardo's house as long as he did not call the police. Neither Leobardo or his wife, who also came downstairs at least once, saw Parraz or Buchanan with a gun.

Buchanan telephoned Chavez and asked her what she wanted from Torres; she replied she wanted him to leave her alone. Buchanan handed the phone to Torres and told him to tell Chavez it was over and he would not have anything more to do with her. Torres complied. After Buchanan and Parraz learned Torres did not have any money, they asked if he and any connections they could tax. [footnote 4: A primary activity of the Mexican Mafia is to tax drug dealers who are forced to pay a portion of their proceeds to the Mexican Mafia.] Torres called a drug dealer named Louie and made arrangements to meet him at a taco shop in Chula Vista for purposes of setting up a taxing situation.

Buchanan, Parraz and Torres left the house and drove away. Buchanan was the driver, Torres sat in the passenger seat, and Parraz sat in the back seat. Officer Perry McIvor, a task force member, was concerned Torres's life could be in danger and contacted two patrol officers to make a traffic stop. When the officers pulled behind Buchanan's vehicle and activated the overhead lights on their car, one of the officers saw Parraz lean forward. Parraz extended a gun around the right side of the front passenger seat and told Torres to take the gun. As Buchanan pulled the car over and stopped, Torres opened the car door and ran. San Diego Police Officer John Beilstein chased Torres and saw him throw a silver gun against a building; the gun went off. The gun was a loaded semi-automatic firearm. While being handcuffed, Torres exclaimed: " 'The gun wasn't mine. The guy in the back seat gave it to me and told me to run . . . . I can't go back to prison. I'm dead. They're going to kill my family.' "

San Diego Police Officer Javier Nunez pulled Buchanan from the car and found a loaded .38 caliber semi-automatic firearm inside his pants. Police also seized a blue clip-on pouch from Buchanan; inside the pouch was 23.4 grams of methamphetamine (18.9 grams pure power), some marijuana and a wallet containing nine $100 bills. During the vehicle search, police found a shaving kit containing receipts, telephone numbers, a notebook and a digital scale. The outside pouch of the kit contained .24 grams of methamphetamine in a small bindle.

Chavez learned of the arrest from Brooks. When Chavez returned to work at Donovan on August 27, she had sex with Brooks in a restroom off the EOP housing unit's sally port. At trial, Chavez testified she had sex with Brooks because she was stressed and she was grateful for his effort to help her. For months Chavez withheld information from prison officials, the San Diego Police Department and the FBI. Ultimately, Chavez resigned from her job and pleaded guilty to making a criminal threat and admitted a street gang enhancement; charges of assault with a deadly weapon and kidnaping were dropped. As part of the plea bargain, Chavez agreed to testify truthfully in the prosecution cases against Buchanan, Parraz and Brooks; the People agreed to relocate her in a witness protection program.

/ / /

Torres and his brother's family were relocated and placed in a witness protection program. They had to be moved again after committing crimes.

At Buchanan's and Parraz's trial, the jury heard 11 taped phone conversations between Brooks and Buchanan and other conversations the two had with Torres and Chavez. Additionally, the prosecution presented Torres, Chavez and two gang experts as witnesses.

Torres testified he believed the Mexican Mafia put a "green light" on him for disobeying a direct order and causing Buchanan's arrest. Torres also believed he had no choice but to tell law enforcement they had a Big Homie so he could go into protective custody and thus avoid being "smoked" by the Mexican Mafia.

Steve Contreras, a member of the gang intelligence unit of the Department of Corrections, testified about the history and structure of the Mexican Mafia, also known as La Eme. [footnote omitted.] The Mexican Mafia is the "umbrella" for all Southern California Hispanic gang members in the state's prisons; those individuals are called Surenos and are basically the foot soldiers in the Mexican Mafia. The Mexican Mafia is one of the main prison gangs that control California prisons; the other are the Black Guerilla Family, the Aryan Brotherhood and the Nuestra Familia (Northern California Hispanic gang members). As of December 2005, there were 1,789 Mexican Mafia members in California prisons, including 152 members validated by prison officials, 993 associates, 461 dropouts and 183 inactive members.

Contreras testified Hispanic gangs started the Mexican Mafia in the 1950's for self-protection. Later, the Mexican Mafia began operating as a crime syndicate and organized criminal activity both inside and outside of the prison system. Inside the prisons, the Mexican Mafia controls drug trafficking by, among other things, "taxing" — collecting a third of the proceeds from inmates who deal drugs. The Mexican Mafia maintains its power through intimidation and control by arranging assaults and homicides. Contreras testified the Mexican Mafia sometimes used prison guards as "tools" to advance their operations.

Outside the prisons, the Mexican Mafia conducts the same activities plus extortion, kidnaping and torture. If a drug dealer refuses to pay the tax to a Big Homie — a member of the Mexican Mafia at the top of the gang's hierarchy — the dealer will be "taxed hard," which means he will be duct taped, beaten and robbed of his drugs and valuables so that he realizes he better voluntarily pay the tax next time or be tortured, kidnaped or killed.

According to Contreras, prison officials validated Buchanan as a Big Homie for the Mexican Mafia in 1989. As a Big Homie, Buchanan had the authority to mediate disputes. Brooks was going to be classified as a validated associate in the Mexican Mafia as a result of this case. The Mexican Mafia often used people such as Parraz, who were not members or associates, to carry out its operations.

Contreras testified he was familiar with Buchanan, whom he said was involved in distributing drugs, extortion and ordering assaults. Contreras also testified about the consequences of disobeying an order from a Big Homie.

Contreras opined Buchanan became involved in a love triangle between Brooks, Torres and Chavez because as a prison guard Chavez was valuable to the Mexican Mafia.

San Diego Police Detective Mike Gutierrez, a member of the gang task force, opined the Mexican Mafia engages in a pattern of criminal activity. Gutierrez testified

the instant offenses were committed for the benefit of the Mexican Mafia.  According to Gutierrez, Torres was threatening to eliminate an invaluable tool for the Mexican Mafia by exposing a guard who potentially could pass drugs, sneak cell phones and help the Mexican Mafia with other illicit business inside the prison.

Buchanan stipulated at trial that he had been convicted of a felony within the meaning of section 12021, subdivision (a)(1).

(Lodgment No. 7 at 3-11.)

### III.    PROCEDURAL BACKGROUND

On February 28, 2006, the San Diego County District Attorney filed an amended information (information) charging Richard Garcia, aka Richard Charles Buchanan (Buchanan), with one count of possession of a firearm by a convicted felon (count one), a violation of California Penal Code (Penal Code) § 12021(a)(1), one count of transporting a controlled substance (count two), a violation of California Health and Safety Code (Health and Safety Code) § 11379(a), possession for sale of a controlled substance (count three), a violation of Health and Safety Code § 11378, one count of possession of a controlled substance (count four), a violation of Health and Safety Code § 11377(a), making a criminal threat (count five), a violation of Penal Code section 422, assault with a semi-automatic firearm (count six), a violation of Penal Code section 245(b), and one count of kidnaping for ransom or extortion (count seven), a violation of Penal Code section 209(a).  As to counts two and three, the information also alleged that Buchanan was personally armed with a firearm during the commission of those crimes, within the meaning of Penal Code § 12022(c).  As to count four, the information alleged Buchanan was armed with a firearm, within the meaning of Penal Code § 12022(a)(1).  As to counts five and six, the information alleged Buchanan personally used a firearm, within the meaning of Penal Code § 12022.5(a).  Finally, as to counts five, six and seven, the information alleged the crimes were committed for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote and further and assist criminal conduct by the gang, within the meaning of Penal Code § 186.22(b)(1).  (Lodgment No. 21 at 0008-10.)

Following a jury trial, Buchanan was convicted on all counts.  (Lodgment No. 23, vol. 3 at 0725.01-.07.)  The jury also found true the allegation that Buchanan personally used a firearm during the commission of the kidnaping, and that the kidnaping, making a criminal threat and assault with a semi-automatic firearm were committed for the benefit of, at the direction of, or in association with a

criminal street gang.  (*Id.* 0725.05-.07.)  The jury found not true the allegation that Buchanan was personally armed with a firearm during the transportation, possession and possession for sale of a controlled substance.  (*Id.*)  The trial judge found two of the three prior strike convictions alleged were true.  (Lodgment No. 35, vol. 11 at 1621.)  Buchanan was sentenced to forty-five years-to-life plus ten years in prison.  (Lodgment No 24, vol. 4 at 0901-02.)

Buchanan appealed his convictions to the California Court of Appeal, which affirmed them in a written, unpublished opinion.  (*See* Lodgment Nos. 1-7.)  Buchanan then filed a petition for review in the California Supreme Court and also joined in any claims made by his co-defendant Steve Parraz.  (Lodgment Nos. 8, 9.)  The California Supreme Court denied the petition for review without citation of authority.  (Lodgment No. 10.)

On September 24, 2009, Buchanan filed a petition for writ of habeas corpus in the San Diego Superior Court.  (Lodgment No. 13.)  The state court denied the petition in a written, unpublished opinion. (Lodgment No. 11.)  Buchanan filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 together with a motion for stay in this Court on February 12, 2010.  (*See* ECF No. 1.)  In the petition, Buchanan admitted claims one through seven were unexhausted.  (*See id.* at 6-13.)

On March 29, 2010, Buchanan filed a petition for writ of habeas corpus in the California Court of Appeal.  (Lodgment No. 12.)  He filed a second petition for writ of habeas corpus in the California Court of Appeal on May 12, 2010.  (Lodgment No. 14.)  On May 27, 2010, the state court issued a written opinion denying both petitions.  (Lodgment No. 15.)

On June 21, 2010, Buchanan filed a petition for review of the denial of his habeas corpus petition in the California Supreme Court.  (Lodgment No. 16.)  The Supreme Court issued an order on June 23, 2010 directing Respondent to file an Answer to the petition.  (lodgment No. 17.)  Respondent filed an Answer on July 19, 2010.  (Lodgment No. 18.)

While Buchanan's petition was pending in the California Supreme Court, this Court granted his motion for stay on July 23, 2010.  (ECF No. 26.)  Buchanan filed a reply to Respondent's Answer in state court on August 3, 2010, and the California Supreme Court denied the petition for review of Buchanan's habeas corpus petition on September 7, 2010.  (Lodgment Nos. 19, 20.)

/ / /

On September 15, 2010, this Court issued an order requiring a response to the petition.[2]  (ECF No. 29.)  Buchanan filed a First Amended Petition (FAP) and supporting documents on December 9, 2010.  (ECF No. 40.)  Respondent filed an Answer and a Memorandum of Points and Authorities in Support of the Answer on March 9, 2011.  (ECF No. 51.)  Buchanan filed a Traverse on June 10, 2011, and a Request for Evidentiary Hearing on September 14, 2011.  (ECF Nos. 77, 99.)[3]

## IV.   DISCUSSION

### A.   *Standard of Review*

This Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *See Lindh v. Murphy*, 521 U.S. 320 (1997).  Under AEDPA, a habeas petition will not be granted with respect to any claim adjudicated on the merits by the state court unless that adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding.  28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002).  In deciding a state prisoner's habeas petition, a federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable.  *Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004).  Additionally, the state court's factual determinations are presumed correct, and Buchanan carries the burden of rebutting this presumption with "clear and convincing evidence."  28 U.S.C.A. § 2254(e)(1) (West 2006).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts.  *Bell v. Cone*, 535 U.S. 685, 694 (2002).  The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case.  *Id.*  Additionally, the "unreasonable application"

---

[2]  The Court vacated the stay on October 4, 2010.  (ECF No. 30.)

[3]  Buchanan has filed numerous other motions and documents which are not recounted in the procedural history here.

clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision and presumes it provides the basis for the higher court's denial of a claim or claims. *Ylst v. Nunnemaker*, 501 U.S. 797, 805-06 (1991).  If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law.  *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Andrade*, 538 U.S. at 75-76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).  However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim.  *Early*, 537 U.S. at 8.  "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" *id.*, the state court decision will not be "contrary to" clearly established federal law.  *Id.*  Clearly established federal

law, for purposes of § 2254(d), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Andrade*, 538 U.S. at 72.

B.      *Analysis*

Buchanan alleges eleven claims in his petition: (1) the prosecution presented perjured testimony; (2) his car was stopped and searched in violation of the Fourth Amendment; (3) the prosecution presented false evidence as to what was said on some of the wiretaps; (4) the prosecutor failed to disclose exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); (5) the trial judge exhibited bias; (6) there was excessive security imposed on him at the trial; (7) prosecutorial misconduct; (8) the trial court did not properly limit the scope of the gang expert's testimony; (9) trial counsel was ineffective; (10) appellate counsel was ineffective; and (11) the trial court improperly imposed a $10,000 restitution fine.  (Pet. at 6-16, ECF No. 40; Attach. C, ECF No. 40-1; Mem. of P. & A. Supp. Pet., ECF No. 40-2; Traverse, ECF No. 77.)

Respondent contends claims one through seven, nine and eleven are procedurally defaulted. (Mem. of P. & A. Supp. Answer at 12-18, ECF No. 51-1.)  As to claim eight, Respondent argues the

state court's denial of the claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  (*Id.* at 18-25.)  Respondent does not address claim ten in the Memorandum of Points and Authorities in Support of the Answer, but does argue in the Answer that the state court's resolution of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  (Answer at 19-20, ECF No. 51.)

> 1. *Request for an Evidentiary Hearing*

On page thirty-three of Buchanan's Traverse, he contends he is entitled to an evidentiary hearing on his claims.  (*See* Traverse at 33, ECF No. 77.)  Buchanan also filed a separate request for an evidentiary hearing which repeats the arguments and allegations contained in the petition and supporting documents.  (*See* Req. for Evid. Hrg., ECF No. 99.)

Evidentiary hearings in § 2254 cases are governed by AEDPA, which "substantially restricts the district court's discretion to grant an evidentiary hearing." *Baja v. Ducharme*, 187 F.3d 1075, 1077 (9th Cir. 1999).  The provisions of 28 U.S.C. § 2254(e)(2) control this decision:

> (2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –
>
> > (A) the claim relies on –
> >
> > > (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> > >
> > > (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> >
> > (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for the constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C.A. § 2254(e)(2) (West 2006).

Buchanan argues he is entitled to an evidentiary hearing to resolve his claims of "prosecution teams committing perjury, use of false evidence, fabrication of evidence, suppression of evidence, as well as to demonstrate judicial bias, excessive security effects upon jury, ineffective assistance of counsels at trial and on appeal . . . ." (Traverse at 33, ECF No. 77; Req. for Evid. Hrg. at 1-12, ECF No. 99.)  In order to determine whether to grant an evidentiary hearing, the court must first "determine

whether a factual basis exists in the record to support the petitioner's claim." *Insyxiengmay v. Morgan*, 403 F.3d 657, 669 (9th Cir. 2005) (citing *Baja*, 187 F.3d at 1078). If not, the court must "ascertain whether the petitioner has 'failed to develop the factual basis of the claim in State court.'" *Id.* at 669-70. A failure to develop the factual basis of a claim in state court implies "some lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *See Williams v. Taylor*, 529 U.S. 420, 432 (2000). The Supreme Court has said that "[d]iligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Id.* at 437.

In the present case, a sufficient factual basis exists in the trial transcripts and other records before the Court to resolve the merits of Buchanan's claims. *See Insyxiengmay*, 403 F.3d at 669-70. Moreover, any facts that would be developed at an evidentiary hearing in this Court were never actually presented to the state court, and the state courts, therefore, did not have those facts before them when they rendered their decision. This Court's review of a state court adjudication under 28 U.S.C. § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. ___, 131 S.Ct. 1388, 1398 (2011). Accordingly, the Court recommends Buchanan's request for an evidentiary hearing be **DENIED**.

> 2.    *Whether Claims One Through Seven, Nine and Eleven Are Procedurally Defaulted*

Respondent contends claims one through seven, nine and eleven are procedurally defaulted pursuant to the procedural bar of *In re Dixon*, 41 Cal. 2d 756 (1953), which states that claims which can be raised on direct appeal, must be. Buchanan raised claims one through seven, nine and eleven in a habeas corpus petition filed in the California appellate court which issued a written unpublished opinion denying the petition on the basis of the rule of *Dixon* and citing *In re Martinez*, 46 Cal. 4th 945, 956 (2009), *In re Harris*, 5 Cal. 4th 813, 829 (1993) and *In re Clark*, 5 Cal. 4th 750, 797-98 (1993) as support for this proposition. (Lodgment No. 15.) Buchanan thereafter filed a petition for review of the habeas corpus denial in the California Supreme Court. (Lodgment No. 16.) The California Supreme Court issued an order directing Respondent to file a brief addressing the question "[w]hether petitioner established a prima facie case for relief, such that this court should grant the petition for review, and transfer the matter to the Court of Appeal with instructions to issue an order to show cause." (Lodgment

No. 17.)  Following the briefing, the state supreme court denied the petition for review without citation

of authority.  (Lodgment Nos. 19, 20.)

    a. *Effect of Trigueros v. Adams*

    The Ninth Circuit recently addressed a similar situation in a case concerning California's

timeliness bar.  In *Trigueros v. Adams*, __ F.3d __, 2011 WL 4060503 (9th Cir. 2011), Trigueros filed

a habeas corpus petition in the Los Angeles Superior Court, which rejected the petition as untimely

citing *In re Clark*.  The state appellate court then denied a subsequently filed habeas corpus petition with

the statement, "The petition for writ of habeas corpus is denied," and citing no case.  *Id.* at *1.  Trigueros

then filed a habeas corpus petition in the California Supreme Court.  That court ordered Respondent to

file an informal brief on the merits.  *Id.*  In federal court, the Attorney General argued the time during

which Trigueros' habeas corpus petitions were pending in state court was not tolled under AEDPA's

statute of limitations because the state superior court had rejected the petition as untimely and

subsequent state court rejections were assumed to be on the same grounds as the lower courts' decisions.

*Id.* at *2.  The Ninth Circuit disagreed:

> There are, however, compelling factual circumstances in this case signaling that the California Supreme Court did consider and reject the States' timeliness argument. Specifically the California Supreme Court requested informal briefing on the merits, even though the Superior Court made a finding of untimeliness and the Court of Appeal summarily denied the petition.  We find this highly significant.  Additionally, the State briefed the timing issue and Trigueros responded.  The California Supreme Court thus had before it all of the timeliness arguments from the parties.  Given these factual circumstances, we rely on the California Supreme Court's orders practice explained in *Robbins* and conclude that it considered Trigueros's petition timely because the California Supreme Court had the timeliness question before it, and did not cite to cases involving a timeliness procedural bar.  *See Robbins*, 77 Cal.Rptr.2d 153, 959 P.3d at 340 n. 34.

*Id.* at *5.

    Although *Trigueros* did not concern *Dixon*, the Ninth Circuit referenced the following statement

by the California Supreme Court's in *Robbins* as the basis for its conclusions:

> [W]hen respondent asserts that a particular claim or subclaim should be barred under *Waltreus*, *supra*, 62 Cal.2d 218, 42 Cal.Rptr. 9, 397 P.2d 1001, or *Dixon*, *supra*, 41 Cal.2d 756, 264 P.2d 513, or the related bars of repetitiveness (*In re Miller*, *supra*, 17 Cal.2d 734, 735, 112 P.2d 10) or successiveness (see *ante*, fn. 9), or is untimely, and when, nevertheless, our order disposing of a habeas corpus petition does not impose the proposed bar or bars as to that claim or subclaim, this signifies that we have considered

respondent's assertion and have determined that the claim or subclaim is not barred on the cited ground or grounds.

*Robbins*, 18 Cal. 4th at 814, fn.34.

Thus, the Court concludes that *Trigueros*' rationale applies equally in this case. The court of appeal rejected Buchanan's petition for writ habeas corpus on *Dixon* grounds. (Lodgment No. 15.) The California Supreme Court asked for briefing on whether Buchanan had stated a prima facie case for relief. (Lodgment No. 17.) In his Answer in state court, Respondent briefed the issue of procedural default pursuant to *Dixon*. (Lodgment No. 18). The California Supreme Court's rejection of the petition for review did not cite *Dixon* or any other procedural bar. (Lodgment No. 20.) Accordingly, the Court concludes claims one through seven, nine and eleven are not procedurally barred.

b. *Procedural Default*

In the event *Trigueros* does not apply, the Court will address Respondent's procedural default argument. The Ninth Circuit has held that because procedural default is an affirmative defense, Respondent must first "adequately [plead] the existence of an independent and adequate state procedural ground . . . ." *Bennett v. Mueller*, 322 F.3d 573, 586 (9th Cir. 2003). In order to place the defense at issue, Buchanan must then "assert[] specific factual allegations that demonstrate the inadequacy of the state procedure . . . ." *Id.* The "ultimate burden" of proving procedural default, however, belongs to the state. *Id.* If the state meets its burden under *Bennett*, federal review of the claim is foreclosed unless Buchanan can "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

i. *Independence*

A state procedural rule is "independent" if the state law basis for the decision is not interwoven with federal law. *Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983); *Harris v. Reed*, 489 U.S. 255, 265 (1989). A ground is "interwoven" with federal law if the state has made application of the procedural bar depend on an antecedent ruling on federal law such as the determination of whether federal constitutional error has been committed. *See Ake v. Oklahoma*, 470 U.S. 68, 75 (1985). In *Robbins*, 18 Cal. 4th at 770, the California Supreme Court stated that it would no longer consider federal law when

1  denying a habeas claim as procedurally barred under *Clark* or *Dixon*.  *Bennett*, 322 F.3d at 582-82; *see*

2  *also Park v. California*, 202 F.3d 1146, 11561 (9th Cir. 2000).  Although the  Ninth Circuit has not

3  specifically determined whether a post-*Robbins* application of the *Dixon* rule is independent of federal

4  law, the *Bennett* court's analysis of the independence of *Clark* compels the same result for claims barred

5  pursuant to *Dixon*.  The pre-*Robbins* application of the two procedural bars was similar in that the

6  invocation of either *Dixon* or *Clark* required the state court to determine if there existed fundamental

7  constitutional error that would excuse the petitioner's default, and such an analysis necessarily involved

8  the consideration of federal law.  *Bennett*, 322 F.3d at 581-82; *see also LaCrosse v. Kernan*, 244 F.3d

9  702, 707 (9th Cir. 2001) (observing that consideration of federal law in barring claims as pretermitted

10  is "analogous" to consideration of federal law in barring claims as untimely).  Furthermore, in *Protsman*

11  *v. Pliler*, 318 F. Supp. 2d 1004, 1007-08 (S.D. Cal. 2004), a judge of this Court found a post-*Robbins*

12  application of *Dixon* to be independent of federal law, and this Court agrees with that conclusion.

13  Accordingly, Respondent has met his initial burden under *Bennett* to establish that *Dixon* is an

14  independent state procedural bar.  *Bennett*, 322 F.3d at 586.

15          ii.  *Adequacy*

16        Respondent argues that the United States Supreme Court's decisions in *Walker v. Martin*, 562

17  U.S. __, 131 S.Ct. 1120 (2011) and *Beard v. Kindler*, 130 S.Ct. 612 (2009), effectively overruled the

18  Ninth Circuit's definition of adequacy as "well established and consistently applied" with a new

19  definition, "firmly established and regularly followed." (Mem. of P. & A. Supp. Answer at 12-18, ECF

20  No. 51-1.)  Respondent also asserts the *Dixon* bar is adequate under this definition.  (*Id.*)  It is not

21  necessary for this Court to decide whether *Walker*, *Beard* and *Bennett* state different definitions for the

22  term "adequate" because Respondent has met his burden under either standard by "adequately pleading

23  the existence of an independent and adequate state procedural ground . . . ."  *Bennett*, 322 F.3d at 586.

24  Respondent's initial burden under *Bennett* is satisfied.  *Bennett*, 322 F.3d at 586.

25          iii.  *Petitioner's Burden*

26        The burden now shifts to Petitioner.  In order to place the defense at issue, Buchanan must cite

27  to specific examples where the rule has not been consistently applied.  *Id.*  In his Traverse, Buchanan

28  attempts to rebut Respondent's showing.  First, he states that *Dixon* does not apply because "grounds

one through seven and nine through eleven concern matters, in part, [which are] not shown in the transcripts" and that appellate counsel has specifically told him that those claims could not be raised on direct appeal because the evidence that supported the claims was not part of the record on appeal. (Traverse at 44-46, ECF No. 77.)

Buchanan also states that "the claims raised by Petitioner are intertwined not only 'with new evidence,' *id.*, but also with Petitioner's ineffective assistance of counsel claims." (*Id.* at 46.) Buchanan goes on to cite *Protsman v. Pliler*, 318 F. Supp. 2d 1004 (S.D. Cal. 2004) for the proposition that "California's procedural bar rests on independent state grounds unless otherwise noted" and further notes that "the California Court of Appeal cited a United States Supreme Court decision in its denial, i.e. *Smith v. Robbins* (2000) 528 U.S. 259, 285." (*Id.* at 47.) He further argues that there is "an exception to the general rule . . . where claimed constitutional error is both clear and fundamental, *In re Harris*, (Cal. 1993) 5 Cal. 4th 813, 830." (*Id.*)

Nowhere does Buchanan cite to specific instances where the *Dixon* rule has not been consistently applied as required by *Bennett*. *Bennett*, 322 F.3d at 586. Accordingly, Buchanan has not met his interim burden under *Bennett*. *Id.*

####            iv. *Respondent Has Met His Burden Under Bennett*

For the foregoing reasons, the Court concludes that Respondent has established that, to the extent the state court imposed a *Dixon* bar, it is an independent and adequate procedural bar to claims one through seven, nine and eleven.[4] *Bennett*, 322 F.3d at 586. Federal review of the claim is therefore barred unless Buchanan can demonstrate cause for the default and actual prejudice or a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750.

####            v. *Cause*

The cause prong is satisfied if Buchanan can demonstrate some "objective factor" that precluded him from raising his claims in state court, such as interference by state officials or constitutionally ineffective counsel. *McClesky v. Zant*, 499 U.S. 467, 493-94 (1991). Buchanan does claim that appellate counsel was ineffective for failing to raise grounds one through seven and eleven on appeal. (Pet. at 15, ECF No. 40; Attach. C at 36-38, ECF No. 40-1.) As discussed below, however, in section

---

[4] The effect of the imposition of *Dixon* on claim nine is addressed in section IV(B)(10) of this R&R.

IV(B)(11) of this Report and Recommendation (R&R), this Court concludes that appellate counsel was not ineffective for failing to raise these claims in state court. Accordingly, this cannot form the basis for a successful showing of cause under *Coleman*. Buchanan does not allege any other "objective factor" that precluded him from raising this claim, and thus he has not established cause for the default. *McClesky*, 499 U.S. at 493-94.

### vi. *Prejudice*

"Prejudice [sufficient to excuse procedurally barred claims] is actual harm resulting from the alleged error." *Vickers v. Stewart*, 144 F.3d 613, 617 (9th Cir. 1998). Buchanan has failed to establish prejudice resulting from the state court's refusal to address the merits of the claims one through seven, nine and eleven because, as discussed below in section IV(B)(3)-(12) of this R&R, his claims are meritless.

### vii. *Fundamental Miscarriage of Justice*

Buchanan has also failed to demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. *See Coleman*, 501 U.S. at 750. The Supreme Court has limited the "miscarriage of justice" exception to petitioners who can show that "a constitutional violation has probably resulted in one the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327 (1995). "Actual innocence" means factual innocence, not simply legal insufficiency; a mere showing of reasonable doubt is not enough. *See Wood v. Hall*, 130 F.3d 373, 379 (9th Cir. 1997). Buchanan has not presented evidence sufficient to establish he is actually and factually innocent of the charges of which he was convicted. Thus, Buchanan has not satisfied the fundamental miscarriage of justice exception, and the claims are procedurally defaulted. *Schlup*, 513 U.S. at 327.

### c. *Conclusion & Standard of Review*

If *Trigueros* applies, the claims are not procedurally defaulted and the Court presumes the California Supreme Court addressed Buchanan's claims on the merits. *Trigueros*, __ F.3d __, 2001 WL 4060503 at *5. In that case, this Court must conduct an independent review of the record to determine whether the state court's denial of the claims was contrary to, or an unreasonable application of, clearly established Supreme Court law. *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002). If, on the other hand, Buchanan's claims are procedurally defaulted and this Court nevertheless addresses the merits of

the claims, the Court must conduct a de novo review. *Id.* at 1167-68. Although it is not clear which standard of review to apply, the Court need not decide the issue as the claims fail even under the more stringent de novo standard of review.

>    3.    *The Prosecutor's Use of Perjured or False Testimony (Claims One and Three)*

Buchanan claims the prosecutor used perjured testimony to convict him. (Pet. at 6, ECF No. 40; Attach. C to Pet. at 6-8, ECF No. 40-1; Mem. of P. & A. Supp. Pet. at 4-18, ECF No. 40-2.) Specifically, Buchanan alleges several instances in which Detective McIvor lied at both the hearing on the motion to suppress evidence and at trial. (*Id.*)[5] Buchanan also claims the prosecutor presented inaccurate translations of the wiretapped phone calls between he and Brooks, which in turn provided a false basis upon which the jury could have concluded that Buchanan was planning to harm Torres. (*Id.*) Respondent contends the claims are procedurally defaulted. (Answer at 8-9, 10-11, ECF No. 51; Mem. of P. & A. Supp. Answer at 12-19, ECF No. 51-1.) Because it is unclear whether this claim is procedurally defaulted, the Court will analyze this claim de novo. *Pirtle*, 313 F.3d at 1167.

Where a prosecutor is accused of presenting false or altered evidence or testimony, "the petitioner must show that (1) the . . . evidence was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) the false testimony was actually material." *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003) (citing *Napue v. People of the State of Illinois*, 360 U.S. 264, 269-71 (1959)); *see also United States v. Agurs*, 427 U.S. 97, 103 (1976). However, the presentation of conflicting versions of events, without more, does not constitute knowing presentation of false evidence. *United States v. Geston*, 299 F.3d 1130, 1135 (9th Cir. 2002) (citing *United States v. Sherlock*, 962 F.2d 1349, 1364 (9th Cir. 1989)). The Court will address each of the instances alleged by Buchanan.

>    a. *McIvor's Statements About the Identity of the Passengers Inside Buchanan's Car*

Many of Buchanan's complaints are about Detective McIvor's testimony at the preliminary hearing and the hearing on the motion to suppress, not the trial. Buchanan's claim is that his convictions

_____

[5] To the extent Buchanan's claim is that McIvor's statements at the hearing on the motion to suppress evidence were false, or that the falsity of those statements mean the motion should have been granted, relief is precluded by *Stone v. Powell*, 428 U.S. 465, 494 (1976) as discussed in Section IV(B)(4) of this Report and Recommendation.

1  are based on false evidence.  Thus, while contradictions in testimony given before trial may shed light

2  on whether testimony at the trial was truthful, it is the testimony that was presented to the jury, not

3  contradictions in the testimony from the preliminary hearing and the hearing on the motion to suppress

4  evidence, that must form the factual basis for this claim.

5        Buchanan contends McIvor lied about when in the course of the investigation he directed the

6  stop of Buchanan's car.  (Pet. at 6, ECF No. 40; Attach. C at 6-8, ECF No. 40-1; Mem. of P. & A. Supp.

7  Pet at 8-9, ECF No. 40-2.)  According to Buchanan, McIvor testified at the preliminary hearing there

8  were three people in the car when he directed Officer Javier Nunez to  stop it, (Lodgment No. 12,

9  Attach. F, Ex. 3 at 11), but contradicted this statement at the hearing on the motion to suppress evidence

10  when he testified he told Nunez "Buchanan and another person were going over to pick up Triste and

11  that they were armed, that they were probably going to kill him, and that we needed them to stop the

12  vehicle to prevent that," meaning that there were two people in the car.  (Lodgment No. 12, Attach. F,

13  Ex. 4 at 11.)

14        At trial, McIvor testified that on August 25, 2004, he received information from the wiretap on

15  Buchanan's phone that Jessica Chavez was calling Buchanan to complain that an individual named

16  "Triste" (Torres) was harassing her.[6]  (Lodgment No. 33, vol. 9 at 1027.)  Buchanan was very upset and

17  was going to go over to Chavez's house to talk to her.  (*Id.* at 1028.)  McIvor, who was on surveillance,

18  saw Buchanan arrive at Chavez's house, then learned from other officers on surveillance that the car

19  drove away.  (*Id*. at 1033-34.)  McIvor believed, on the basis of information from the wiretaps, that

20  Buchanan was on his way to see Triste.  (*Id.* at 1068.)  Other members of the surveillance team saw

21  Buchanan and Parraz arrive at a house and go inside.  (*Id.* at 1069.)  Buchanan, Parraz and Torres

22  eventually left the residence and drove away, followed by the surveillance team.  (*Id.* at 1070.)  On the

23  basis of information he had heard on the wiretap, he believed Triste was in the car with Buchanan and

24  Parraz and that his life was in danger.  He told Officer Nunez that the car would have to be stopped.  (*Id*.

25  at 1034.)  He communicated this to Nunez while Buchanan, Parraz and Triste were inside the house.

26  (*Id.* at 1071.)

27        First, Buchanan has provided no evidence that the testimony McIvor gave at trial was false,

28

---

[6]  Because "Triste" and "Torres" are the same person, the names are used interchangeably.

1   much less that the prosecutor knew it was false.  *See Napue*, 360 U.S. at 269-71; *Zuno-Arce*, 339 F.3d

2   at 889.  According to Buchanan, McIvor testified at the preliminary hearing that there were three people

3   in the car when he advised Nunez they would have to stop it.  (Lodgment No. 12, Attach. F, Ex. 3 at 11.)

4   At the hearing on the motion to suppress, McIvor testified he told Nunez that "Buchanan and another

5   person were going over to pick up Triste . . . and that we needed [him] to stop the vehicle . . . . "

6   (Lodgment No. 12, Attach. F, Ex. 4 at 11.)  At that point, therefore, there were two people in the car.

7   At trial, McIvor testified he told Nunez the car would have to be stopped when Buchanan, Parraz and

8   Triste were in the house, just before all three got in the car and drove away.  (Lodgment No. 33, vol. 9

9   at 1071.)  On all three occasions, McIvor was roughly referring to the same small window of time.  The

10  contradictions in testimony Buchanan points to are minor discrepancies that cannot support an inference

11  of false testimony or that the prosecutor knew McIvor was lying.  *See Geston*, 299 F.3d at 1135.

12          In addition, the evidence Buchanan alleges was false — when McIvor communicated the need

13  to stop Buchanan's car to Nunez — was not material because there was "[no] reasonable likelihood that

14  the false testimony could have affected the judgment of the jury."  *Hayes v. Brown*, 399 F.3d 972, 984

15  (9th Cir. 2005) (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985) (internal quotation marks

16  omitted).)  The discrepancies Buchanan points to relate only to the question whether Buchanan's car was

17  stopped in a manner consistent with the Fourth Amendment, not the substantive evidence of the crimes

18  he was alleged to have committed.  The state's case rested almost entirely on the wiretaps and the

19  testimony of Chavez and Torres.  When McIvor told Nunez to stop Buchanan's car did not call into

20  question the validity of the information provided by the wiretaps, or the credibility of Chavez or Torres.

21          For all the foregoing reasons, Buchanan has failed to establish his convictions are based on false

22  evidence.  *See Napue*, 360 U.S. at 269-71; *Zuno-Arce*, 339 F.3d at 889.  He is not entitled to relief as

23  to this claim.

24          b.   *McIvor's Statements About the Reason for the Stop of Buchanan's Car*

25          Buchanan next complains about McIvor's testimony regarding the reason he directed the stop

26  of Buchanan's car.  (Pet. at 6, ECF No. 40; Attach. C at 6-8, ECF No. 40-1; Mem. of P. & A. Supp. Pet.

27  at 4-18, ECF No. 40-2.)  As with the preceding claim, many of the statements Buchanan complains

28  about were made at the preliminary hearing or the hearing on the motion to suppress evidence.  For the

same reasons discussed above, it is to McIvor's trial testimony that this Court must look in determining whether Buchanan's convictions are based on false evidence, and McIvor's testimony before trial is relevant only to the extent it helps to establish his testimony at trial was false.

Buchanan's claim involves the backdrop to the stop of his car. At trial, McIvor testified that by listening to the wiretaps, he learned that an individual referred to as "Triste" was "interfering in Mexican Mafia business." (Lodgment No. 33, vol. 9 at 1025.) McIvor attempted to learn the identity of Triste and determined he probably was Jesse Gutierres, a recent parolee. (*Id.* at 1026.) On August 25, 2004, McIvor learned from the wiretaps Buchanan was upset with Triste and was going to drive over to see him with another, unknown individual. (*Id.* at 1028.) McIvor was in a surveillance position outside Chavez's house and saw Buchanan drive up. (*Id.* at 1030.) The next time he saw the car, it was driving on highway 5 with three people in it. (*Id.* at 1031-32.) He had a brief view of the car's occupants and believed one of them to be Gutierres based on his comparison with a mug shot he had obtained. (*Id.* at 1032.) He also believed, based on information he had heard on the wiretaps, that Buchanan posed a threat to "Triste's" life and that the car would have to be stopped. (*Id.* at 1033-34.) At that point, McIvor told Nunez that the car would have to be stopped because of the threat, but also told him there was a parolee at large in the car, that the car could be stopped on that basis in order to avoid disclosing the wiretaps. (*Id.* at 1034.)

At the hearing on the motion to suppress evidence and the preliminary hearing, McIvor testified he told Nunez they needed to stop Buchanan's car because he was concerned about Triste's safety, that the people inside the car were probably armed, and that he did not need to use the hanging licences plate as the reason for the stop because there was a parolee at large in the car. (Attach. C at 6-8, ECF No. 40-1; Mem. of P. & A. Supp. Pet at 7-18, ECF No. 40-2.) Buchanan contends McIvor's testimony is contradicted by the transcript of the radio transmissions between McIvor and other officers (the TAC 3 talkgroup) which occurred before the stop. (*Id.*) As Buchanan points out, the transcript does indicate McIvor told Nunez that probable cause for the stop was the hanging license plate, not the possibility of there being a parolee at large in the car. (Lodgment No. 12, Attach. F, Ex. 6.) In addition, the TAC 3 talkgroup transcript does not reflect that McIvor told Nunez he feared for Triste's safety. But the conversation recorded on the TAC 3 talkgroup transcript is not the only conversation McIvor had with

Nunez before the stop.  McIvor testified at the hearing on the motion to suppress evidence that he was in communication with other officers via radio transmissions and via cell phone, and that he used his cell phone to tell Nunez Buchanan's car would have to be stopped, that he was concerned for Triste's safety and that a parolee at large was in the car and could be used as probable cause for the stop. (Lodgment No. 27, vol. 3 at 76, 80.)  That conversation would not have been recorded in the TAC 3 talkgroup transcript of the radio transmissions.  Thus, Buchanan has not established the testimony he complains of was false.

In any event, the testimony Buchanan alleges was false was not material for the same reasons discussed above.  McIvor's communications with Nunez about the reason for the stop does not call into question the validity of the information provided by the wiretaps, or the credibility of Chavez or Torres, which form the basis for the substantive evidence of guilt presented at trial.  There was "[no] reasonable likelihood that the false testimony could have affected the judgment of the jury."  *Hayes*, 399 F.3d at 984.  For all the foregoing reasons, Buchanan is not entitled to relief as to this claim.

c.      *Other Statements By McIvor*

Buchanan also alleges several other false statements by McIvor at the hearing on the motion to suppress evidence.  Buchanan alleges McIvor testified he told Nunez the people in Buchanan's car were armed and would probably kill Triste but that there was no evidence in the wiretaps to support this claim.  (Attach. C at 6, ECF No. 40-1; Mem. of P. & A. Supp. Pet at. 11, ECF No. 40-2.)  In the transcript of the wiretap between Buchanan and an individual named Corrado, however, Buchanan, suggests he will be armed when he meets with Torres:

BUCHANAN: Yeah, uh . . . well, we're going to talk right now.  If . . . if he gets out of line well, uh . . .  you know, anything goes.

CORRADO: [CHUCKLES] All right.

BUCHANAN: We are prepared, no problem, you know?

CORRADO: Yeah.

(Lodgment No. 27, vol. 1 at 0134.)

In addition, McIvor testified that, based on his training and experience, when a person defies an order from a "Big Homie," the consequence is usually serious injury or death.  Torres had disobeyed

Buchanan, a "Big Homie," and Buchanan, who was angry about Torres' disobedience, was traveling to see Torres. (Lodgment No. 33, vol. 9 at 1086.)  Torres himself testified he believed Buchanan was coming to "smoke" him, i.e., kill him. (Lodgment No. 31, vol. 7 at 711.)  Under these circumstances, Buchanan has not established McIvor's testimony was "actually false" or that the prosecution knew it was false. *Zuno-Arce*, 339 F.3d at 889; *Napue*, 360 U.S. at 269-71.

Buchanan also claims McIvor falsely testified at the hearing on the motion to suppress evidence that he told Nunez Buchanan's car needed to be stopped.  Buchanan bases his claim on the transcript of the TAC 3 talkgroup which indicates FBI Agent Desarno was the one who made this statement. (Mem. of P. & A. Supp. Pet. at 11.)  As with Buchanan's claim regarding McIvor's testimony that he told Nunez to stop Buchanan's car using the presence of a parolee at large as probable cause, the TAC 3 talkgroup transcript does not account for the cell phone conversations between McIvor and Nunez. Nunez corroborated McIvor's testimony by testifying at both the hearing on the motion to suppress and the trial that McIvor called him and told him Buchanan's car needed to be stopped. (Lodgment No. 27, vol. 3 at 36; Lodgment No. 33, vol. 9 at 970.)  Thus, Buchanan has not established McIvor's testimony at trial was "actually false."  *Zuno-Arce*, 339 F.3d at 889; *Napue*, 360 U.S. at 269-71.

Next, Buchanan argues McIvor falsely testified that the identity of the individual in the front seat of Buchanan's car was the individual they needed to identify.  This is contradicted by the transcript of the TAC 3 talkgroup wherein Agent Desarno states it is the identity of the person in the back seat that is at issue. (Mem. of P. & A. Supp. Pet. at 11.)  There does appear to be a discrepancy between McIvor's testimony at trial and Desarno's statements on the TAC 3 talkgroup transcript.  Given the fact that police did not know the identity of two of the three individuals in Buchanan's car, however, this is a minor discrepancy. *Geston*, 299 F.3d at 1135 (stating that the presentation of conflicting versions of events, without more, does not constitute knowing presentation of false evidence).  Buchanan has not established McIvor's trial testimony was actually false or that the prosecutor knew it was false. *Zuno-Arce*, 339 F.3d at 889; *Napue*, 360 U.S. at 269-71.  In any event, the testimony was not material for the same reasons discussed above.  Any confusion over which of the passengers police thought was a parolee at large does not call into question the validity of the information provided by the wiretaps, or the credibility of Chavez or Torres, and there was "[no] reasonable likelihood that the false testimony

could have affected the judgment of the jury." *Hayes*, 399 F.3d at 984. For all the foregoing reasons, Buchanan is not entitled to relief as to this claim.

Buchanan also claims McIvor falsely testified at the hearing on the motion to suppress that Buchanan ordered Torres to stay where he was so Buchanan could come get him. (Attach. C at 6-8, ECF No. 40-1; Mem. of P. & A. Supp. Pet. at 12, ECF No. 40-2.) McIvor did testify at the hearing on the motion to suppress evidence that Buchanan had ordered Torres to stay where he was. (Lodgment No. 27, vol. 3 at 100.) There is no transcript of the call between Torres and Buchanan. Buchanan stated in the phone call to Corrado that he had spoken to Torres and told him he had broken his word to the "Big Homie." (Lodgment No. 21, vol. 1 at 0130.) Buchanan then asked Torres for the address where Torres was located, and Torres responded that he was at Pancho's house but would go back to his own house; Buchanan said he replied, "Okay, it's cool." (*Id.* at 132.) Torres testified to the same series of events at trial. (Lodgment 31, vol. 7 at 710.) Thus, it is not clear upon what basis McIvor based his statement at the hearing on the motion to suppress that Buchanan ordered Torres to stay where he was. But, as with Buchanan's preceding claims, the only testimony that matters for his claim that his convictions are based on false evidence is McIvor's testimony at trial. McIvor did not testify at trial that Buchanan ordered Torres to stay where he was. (Lodgment No. 33, vol. 9 at 1020-1141 [testimony of Perry McIvor].) Accordingly, Buchanan has failed to establish McIvor's trial testimony was "actually false" or that the prosecutor knew it was false. *Zuno-Arce*, 339 F.3d at 889; *Napue*, 360 U.S. at 269-71.[7]

Buchanan complains McIvor falsely testified at the hearing on the motion to suppress evidence that he knew from a phone call made by Buchanan to Chavez that Torres had not been harmed at the time police initiated the stop of Buchanan's car. (Mem. of P. & A. Supp. Pet. at 13, ECF No. 40-2.) In the transcript of a phone call between Buchanan and Chavez which occurred at 5:43 p.m., about seven minutes before police stopped Buchanan's car, Chavez, who called Buchanan, asks "[I]s he still with you?" to which Buchanan replies, "Yes." Chavez then says, "Oh, okay. Don't, don't say what I'm saying out loud then." (Lodgment No. 21, vol. 1 at 0123; *see also*, Lodgment No. 12, Attach. F, Ex. 1 at 16 [surveillance log].) It appears very likely to the Court that Chavez's question, "[I]s he still with you?" referred to Torres, or, at a minimum, police believed Chavez was referring to Torres.

---

[7] This discrepancy was also not material to whether there was sufficient probable cause to stop Buchanan's car. The probable cause for the stop was the threat to Triste's life.

1    Accordingly, Buchanan has not established McIvor's testimony was false. *Zuno-Arce*, 339 F.3d at 889;

2    *Napue*, 360 U.S. at 269-71.

3         Finally, Buchanan argues McIvor falsely testified he did not know that "Triste" was Torres.

4    (Mem. of P. & A. Supp. Pet. at 14, ECF No. 40-2.)  As support, Buchanan points to the transcript of the

5    TAC 3 talkgroup wherein Officer Rios asks, "[H]ave we run this address here on Elder?"  In response,

6    McIvor replies, "[T]hose are those guys I gave you, the Torresses[.]"  (Lodgment 13, Ex. D at 4.)  The

7    most this shows is that police knew the residence Buchanan was seen entering belonged to the Torreses.

8    It does not establish that McIvor connected Triste's identity to Torres.  Thus, Buchanan has not

9    established McIvor's trial testimony was actually false or that the prosecutor knew it was false.  *Zuno-*

10   *Arce*, 339 F.3d at 889; *Napue*, 360 U.S. at 269-71.  In any event, the testimony was not material for the

11   same reasons discussed above.  Even if McIvor knew Triste was Torres, the prosecution's case was built

12   on the information provided by the wiretaps, and the credibility of the story told by Chavez and Torres.

13   Whether or not McIvor knew the identity of Triste is not relevant.[8]  Thus, there was "[no] reasonable

14   likelihood that the false testimony could have affected the judgment of the jury."  *Hayes*, 399 F.3d at

15   984.  For all the foregoing reasons, Buchanan is not entitled to relief as to this claim.

16        In sum, Buchanan has not established that McIvor testified falsely at trial, that the prosecutor

17   knew he was testifying falsely, or that any allegedly false testimony was material.  *Napue*, 360 U.S. at

18   269-71; *Hayes*, 399 F.3d at 984.  His claim that his convictions are based on false evidence, therefore,

19   fails.

20        d.    *Inaccurate Translations of Wiretapped Phone Conversations*

21        Buchanan alleges the translation of two phrases in the transcript of one of the wiretapped phone

22   conversations between himself and Brooks (tape number 776) which was admitted at trial was

23   inaccurate.  In the first exchange, according to the transcript of the tape admitted at trial, Brooks,

24   speaking to Buchanan, states: "[T]here's one other thing . . .I have a person here that, that, that watches

25   over the businesses I have here."  (*See* Lodgment No. 21, vol. 1 at 0021.)  Buchanan contends the

26   correct translation was:  "I have a person here that takes care of me with what I got, her issues."

27

28        [8]  Whether or not McIvor knew the identity of Triste may have been relevant to whether Buchanan's car
     was stopped in compliance with the Fourth Amendment.  But that issue has already been litigated in state court
     and Buchanan may not attack that ruling in federal court.  *See Stonel*, 428 U.S. at 494.

(Attach. C, Ex. 17 at 9, ECF No. 40-1.)  In the second exchange, Brooks, referring to Torres and his harassment of Chavez, says to Buchanan: "So, I wanted . . . so, so I wanted to talk to him first and if, if he doesn't behave then its like all right, he's fucked and then I'll let you get at him, uh, later, you know what I mean?"  (Lodgment No. 21, vol. 1 at 0024.)  Buchanan contends the phrase "he's fucked" should have been translated as "I know I crapped," a phrase Buchanan says is a jail-house Spanish term for "failed to win."  (Attach. C, Ex. 17 at 7-8, ECF No. 40-1.)  As support for this claim, Buchanan has provided a copy of the motion for a new trial he filed *pro per* with the corrections made to the transcript which was admitted at Brooks' trial and a copy of the minute order noting the prosecution stipulated to those corrections.  (*See* Lodgment 12, Attach. F, Exs. 17, 18.)

While it is clear there was a dispute as to the proper translation of many of the Spanish phrases and idioms spoken on the wiretapped phones, Buchanan has not established that the evidence he alleges was false was "actually material."  *Zuno-Arce*, 339 F.3d at 889; *Napue*, 360 U.S. at 269-71; *Agurs*, 427 U.S. at 103.  As to the first challenged phrase, the allegedly false translation was not material because shortly after the complained-of exchange, the following, unchallenged exchange took place:

> BROOKS: He's about . . .  Yeah, he's trying to, uh, threaten the girl and putting the girl (UI) and all this shit . . . saying that they are going to lose their jobs and all this bull shit, man.
>
> BUCHANAN: Uh, he's (UI) the guy on the streets is fucking with him?
>
> BROOKS: Yeah, the person that helps me out with, with my businesses inside, my connection.
>
> BUCHANAN: Yeah.
>
> BROOKS: It's a, it's a lady that has kids and everything.

(Lodgment No. 21, vol 1 at 0021.)

Thus, even if the first translation ("I have a person here that, that, that watches over the businesses I have here") was false and the corrected version ("I have a person here that takes care of me with what I got, her issues") had been admitted, there is "[no] reasonable likelihood that the false testimony could have affected the judgment of the jury."  *Hayes*, 399 F.3d at 984.

As to the second challenged translation, the phrase "he's fucked," which Buchanan alleges should have been translated as "I crapped" meaning "I failed," there is, again, "[no] reasonable

likelihood that the false testimony could have affected the judgment of the jury." *Hayes*, 399 F.3d at 984. The prosecution's purpose in presenting this tape was to establish Brooks and Buchanan had given Torres a chance to comply with Buchanan's order, Torres had not done so, and therefore Buchanan's intent when he went to Torres' house and took him for a ride in his car was to "get at him," i.e., assault or kill him. If the jury had been given the allegedly correct translation, Brooks would have told Buchanan, "So, I wanted . . . so, so I wanted to talk to him first and if, if he doesn't behave then it's like all right, I failed and then I'll let you get at him, uh, later, you know what I mean?" From this, a reasonable jury could have concluded that Brooks wanted a chance to get Torres to obey Buchanan's order to leave Chavez alone, but that, if Torres did not "behave," Brooks had "failed" in his attempt and Buchanan could "get at him" using presumably more serious measures. The difference in the two translations would not have resulted in a different outcome for Buchanan because they both communicated the same thing about Buchanan's intent.

For all the foregoing reasons, Buchanan has not established that his convictions are based on the introduction of false evidence at his trial. He is not entitled to federal habeas corpus relief as to those claims.

          4.    *Illegal Detention of Buchanan's Vehicle (Claim Two)*

Buchanan argues the state courts erred in denying his motion to suppress evidence based on a violation of his Fourth Amendment rights during the search of the vehicle. (Pet. at 7, ECF No. 40; Attach C at 9-12, ECF No. 40-1; Mem. of P. & A. Supp. Pet. at 19-41, ECF No. 40-2; Traverse at 15-18, ECF No. 77.) "[W]here the state has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone*, 428 U.S. at 494; *Woolery v. Arave*, 8 F.3d 1325, 1326 (9th Cir. 1993). Under California law, Green had the opportunity to litigate, and in fact did litigate, the suppression of evidence on the ground that the stop and search of his vehicle violated the Fourth Amendment. (*See* Lodgment No. 21, vol. 1 at 6.02-6.12; Pet'rs Ex. 4 at 7-26; *see also* Cal. Penal Code § 1538.5; *Gordon v. Duran*, 895 F.2d 610, 613 (9th Cir. 1990).) In addition, he raised this claim in the habeas corpus petitions he filed in the superior, appellate and state supreme courts. (*See* Lodgment Nos. 11-13, 15-16, 20.) Because Buchanan has had "an

opportunity for full and fair litigation of [his] Fourth Amendment claim" in state court, he is not entitled to federal habeas relief. *Stone*, 428 U.S. at 494; *Gordon*, 895 F.2d at 613-14.

5.   *Prosecution's Failure to Disclose Exculpatory or Impeachment Evidence (Claim Four)*

Buchanan claims the prosecution withheld exculpatory evidence, in violation of his federal right to a fair trial. (Pet. at 9, ECF No. 40; Traverse at 18-19, ECF No.77.)  Specifically, Buchanan claims the prosecutor withheld: (1) Torres' prison disciplinary, medical, mental health and housing records; (2) Torres' parole records; (3) wiretap evidence of a phone interview of Chavez by Detective Gutierrez; and (4) wiretap evidence from Torres' phone.  (Pet. at 9, ECF No. 40.)  Buchanan argues this information would have impeached Torres by showing he misrepresented his mental health status in prison, establishing he provided false testimony, and would have shown Detective Gutierrez coerced Chavez to provide false testimony.  (*Id.*)  Because it is unclear whether this claim is procedurally defaulted, the Court will analyze this claim de novo.  *Pirtle*, 313 F.3d at 1167.

Where a prosecutor is accused of withholding exculpatory evidence, a petitioner must show: (1) the evidence was suppressed by the prosecution, either willfully or inadvertently; (2) the withheld evidence was exculpatory or impeachment material; and (3) he was prejudiced by the failure to disclose. *See Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *Benn v. Lambert*, 283 F.3d 1040, 1052-53 (9th Cir. 2002) (citing *United States v. Bagley*, 473 U.S. 667, 676, 678 (1985) and *United States v. Agurs*, 427 U.S. 97, 110 (1976)).  "Evidence is deemed prejudicial, or material, only if it undermines confidence in the outcome of the trial." *Benn*, 283 F.3d at 1053 (citing *Bagley*, 473 U.S. at 676, *Agurs*, 427 U.S. at 111-12).  "Moreover, we analyze all of the suppressed evidence together, using the same type of analysis that we employ to determine prejudice in ineffective assistance of counsel cases." *Id.* (citing *Bagley*, 473 U.S. at 682 and *United States v. Shaffer*, 789 F.2d 682, 688-89 (9th Cir. 1986)).

a. *Torres' Prison Disciplinary, Medical, Mental Health and Housing Records*

Buchanan claims the prosecutor withheld exculpatory evidence in the form of records of Torres' prison disciplinary file, and his medical, mental health and housing records.  Buchanan contends this evidence could have helped him impeach Torres by showing that Torres "misrepresented his mental health and EOP background, his status among the inmate prison population, etc., and that he provided false testimony in [his] case." (Pet. at 9, ECF No. 40; Traverse at 18-19, ECF No. 77.)  In support of

this claim, Buchanan has submitted copies of some of Torres' psychiatric records. (Lodgment No. 12, Attach. F, Ex. 12.) The psychiatric records date from 2002 until 2004 at various penal institutions. They are relatively consistent in their depiction of Torres as depressed and anxious due to his incarceration and inability to contact his wife. (*Id.* at pg. 1-9, 11-13.) According to the records, Torres attempted suicide once in 2002, and was referred to a psychiatrist once in 2003 when his cellmate reported he was going to hurt himself. (*Id.* at 10, 12.) Torres was also on anti-depressants while in prison. (*Id.* at 1-13.) The records also indicate his mood was within normal range at all times, and that he never reported auditory or visual hallucinations, nor did he have suicidal or homicidal ideations. (*Id.* at 1-13.) In the most recent report from September 2004, the attending psychiatrist indicated Torres "suffer[s] from a mood disorder but not sufficiently so that an EOP level of care is required at this time." (*Id.* at 13.) Buchanan has also submitted a rules violation report Torres suffered while in prison which found he had stolen batteries, and a Parole Detail Record for Torres, dated October 27, 2001. (Lodgment No. 12, Attach. F, Ex. 12 at 14-16.)

First, Buchanan has not established that the prosecutor suppressed Torres' prison disciplinary file, and his medical, mental health and housing records because, as the trial judge pointed out, the prosecution was not in possession of Torres' CDCR (California Department of Corrections and Rehabilitation) file. (Lodgment No. 29, vol. 5 at 271-72.) The Department of Corrections Operations Manual (DOM) states that "[i]nmate records shall not be released to any agency . . . or person outside the Department without a court order."[9] (DOM § 71010.11.2.) Thus, Buchanan and the prosecutor had equal access to Torres' CDCR file. Prosecutors cannot be said to have suppressed material that is equally available to the defense. *See Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir. 1996) (stating that "[t]here is no *Brady* violation if the 'defendants, using reasonable diligence, could have obtained the information' themselves").

The failure to establish the prosecutor suppressed Torres' CDCR file, in and of itself, is fatal to Buchanan's *Brady* claim. But Buchanan also has not established the second and third prong of *Brady*. He has not established Torres' CDCR file actually contained any impeachment material. He merely speculates, based on the excerpts he does possess, that it *would have* contained impeachment

---

[9] The regulation makes an exception for the Attorney General.

information.  And, without any specific evidence as to what impeachment evidence Torres' CDCR file contained, Buchanan has also not established the third prong of a *Brady* violation, that the lack of access to the information in Torres' CDCR file "undermines confidence in the outcome of the trial." *Benn*, 283 F.3d at 1053 (citing *Bagley*, 473 U.S. at 676, *Agurs*, 427 U.S. at 111-12).  Even in the absence of the CDCR file, Torres was thoroughly impeached with a variety of misdeeds, lies and crimes.  At trial, Torres was cross-examined by Buchanan's attorney about his heavy drug use, drug dealing, and gun possession, all of which were parole violations.  (Lodgment No. 32, vol. no. 8 at 762-76.)  Parraz's attorney cross-examined Torres about his placement in the EOP, the fact that he suffered from depression and was treated for depression while he was in prison, the medications he was taking for depression, his use of marijuana, PCP, and methamphetamine beginning when he was twelve years old, his crimes against his wife for which he was incarcerated, and his stalker-like behavior toward Chavez.  (*Id.* at 777-85, 800-01.)  Both attorneys also questioned Torres about the favorable treatment he had received in return for his testimony, including the lack of prosecution for his crimes, placement in the witness protection program for himself and his family, and financial assistance from the government.  (*Id.* at 800-05.)  In addition, the defense called Dr. Greg Michel, a forensic psychologist with expertise in drug addiction.  (Lodgment No. 35, vol. 11 at 1403-06.)  Dr. Michel testified that a person who was consuming an "eight ball" (three and a half grams) of methamphetamine a day, the amount Torres said he was consuming, would likely be hyperactive and paranoid, have visual and auditory hallucinations, and could misperceive the intentions of people around them.  (*Id.* at 1413-18.)

Given all of the foregoing, Buchanan has not established the prosecutor suppressed material, exculpatory or impeachment information that undermines the confidence in the outcome of his trial. *Strickler*, 527 U.S. at 281-82; *Benn*, 283 F.3d at 1052-53.  He is not entitled to relief as to this claim.

b.  *Torres' Parole Records*

Buchanan next argues the prosecutor suppressed Torres' parole records.  (Pet. at 9, ECF No. 40; Traverse at 18-19, ECF No. 77.)  Parole records are also in the custody of the CDCR pursuant to DOM § 71010.8.3, which notes that "field files" are those records "maintained by the assigned Parole Agent in the unit parole office."  (DOM § 71010.8.3).  As such, they are also "not to be released to any agency . . . or person outside the Department without a court order."  (*Id.*, § 71010.11.2.)  Thus, they were

1    equally available to the prosecution and defense and were not suppressed.  *See Westley*, 83 F.3d at 726.

2    In addition, Buchanan's speculation as to what might have been contained in Torres' parole records is

3    insufficient to establish the records were material and that he was prejudiced by the their suppression.

4    *Strickler*, 527 U.S. at 281-82.  For the same reasons as discussed above in section IV(B)(5)(a) of this

5    R&R, therefore, Buchanan has not established a *Brady* violation with regard to Torres' parole records.

6    He is not entitled to relief as to this claim.

7            c.  *Wiretap Evidence of a Phone Interview of Chavez by Detective Gutierrez*

8            Buchanan also contends the prosecutor failed to turn over wiretap evidence of Detective

9    Gutierrez's phone interviews of Jessica Chavez.  (Pet. at 9, ECF No. 40; Traverse at 18-19, ECF No.

10   77.)  Buchanan claims this evidence would have established Chavez was coerced into providing false

11   testimony and was coached as to the testimony she did provide.  (Pet. at 9, ECF No. 40; Traverse at 18-

12   19, ECF No. 77.)  As support for this claim, Buchanan has included a copy of a portion of an interview

13   of Chavez by Gutierrez.  (*See* Lodgment No. 12, Attach. F, Ex. 13.)  The origin of this document is not

14   clear, as there is no identifying information on it.

15          Assuming the prosecutor suppressed phone interviews of Chavez, Buchanan has not established

16   the allegedly withheld evidence was exculpatory or impeachment material.  *Strickler*, 527 U.S. at 281-

17   82; *Benn*, 283 F.3d at 1052-53.  The excerpt provided by Buchanan as exhibit 13 reads as follows:

18               CHAVEZ: It wasn't . . . uh, it wasn't like after you're done like oh, you know,
             to do that.  That doesn't, c'mon now . . . .
19
                 GUTIERREZ: . . .  umkay.  Well, can I ask you somethin' though?  You're a
20           correction officer, okay, and you're gonna go have dinner with a Mex . . . full blown
             Mexican mafia member.  Not . . . not an associate, not a homie.  A member where you
21           know what it takes to be a member.  You know the violence it takes to be a member.
             They don't just make Carnales just . . . it's not easy to become a Carnal. You know that,
22           right?

23               CHAVEZ: Well, from what you told me, yeah.

24               GUTIERREZ: Umkay.  Well, you've worked the prison system, too.  You're
             not . . . not . . .
25
                 CHAVEZ: . . .but it . . .it's not accessible to us.  And when . . . whenever
26           Buchanan comes he's thrown in the hole right . . . automatically . . . .

27               GUTIERREZ:  . . . but everybody knows . . . .

28               CHAVEZ: . . . (U) . . . .

GUTIERREZ: . . . but everybody knows why . . . everybody knows that Buchanan's a . . . a Mexican mafia member, correct?

CHAVEZ: An associ . . . yeah, a member, yeah.  Associate.

GUTIERREZ: But . . . well everybody knew he wasn't an associate.  Everybody knew he was a member.  There's a difference.  Rayo was an associate.  Rayo was a . . . he was the . . . he was a key holder.  He called some shots in there.  Triste has a one-two yard.

(Lodgment No. 12, Attach. F, Ex. 13.)

Nothing in the transcript provided by Buchanan establishes Gutierrez coerced Chavez or shaped her testimony, and Buchanan has provided no evidence to show other tapes would establish Gutierrez coerced Chavez, or even that other tapes actually exist.  Finally, because Buchanan has not established whether any further tapes exist or what those tapes contain, he has not shown he was prejudiced.  *Benn*, 283 F.3d at 1053 (citing *Bagley*, 473 U.S. at 676, *Agurs*, 427 U.S. at 111-12).

For all the foregoing reasons, Buchanan has not proven a *Brady* violation occurred with regard to taped phone interviews by Gutierrez of Chavez.  He is not entitled to relief as to this claim.

d.  *Wiretap Evidence from Torres' Phone*

Lastly, Buchanan alleges there was a wiretap on Torres' phone and the prosecution withheld this evidence.  This evidence, he claims, would have shown that Torres was lying at trial.  (Pet. at 9; Traverse at 18-19.)  Buchanan has provided no proof that any such evidence exists.  As such, he cannot establish the prosecutor suppressed the evidence, that it contained exculpatory or impeachment material, or his lack of access to it affected the outcome of his trial in any way.  *Strickler*, 527 U.S. at 281-82; *Benn*, 283 F.3d at 1052-53.  Accordingly, he is not entitled to relief as to this claim.

e.  *Conclusion*

Buchanan has failed to establish the prosecutor withheld any material exculpatory or impeachment evidence.  *See Strickler*, 527 U.S. 281-82.  His *Brady* claims fail.

6.  *Judicial Bias (Claim Five)*

Buchanan argues the trial judge was biased against him, denying him a fair trial.  (Pet. at 10, ECF No. 40; Attach. C at 13-16, ECF No. 40-1; Traverse at 19, ECF No. 77.)  Specifically, Buchanan alleges the following instances of bias: (1) the trial judge's decision to shackle him; (2) the excessive security in the courtroom; (3) the trial judge's refusal to permit defense counsel to examine the

documents he considered to support the shackling and courtroom security measures; (4) the trial judge's reference to Buchanan "pimping" his defense counsel; (5) the trial judge reference to the jury as "idiots"; (6) the trial judge's decision to permit testimony by gang experts which "demonized" Buchanan; (7) the trial judge's failure to take any action despite being aware of problems with the translation of the wiretapped phone calls; (8) the trial judge's denial of Buchanan's *Marsden* motions; (9) the trial court's failure to admonish the jury or take other corrective action after the jury observed Buchanan in shackles and waist chains; (10) the trial judge's denial of defense counsel's request to contact members of the jury post trial; (11) the trial judge's severance of Rodney Brooks from the case; (12) the trial judge's coaching of a prosecution witness during the hearing on the suppression motion; and (13) the trial judge's speculation as to the prosecution's asserted basis for the detention of Buchanan's car at the conclusion of the hearing on the motion to suppress evidence.  (Pet. at 10, ECF No. 40; Attach. C. at 13-16, ECF No. 40-1.)  Because it is unclear whether this claim is procedurally defaulted, the Court will analyze this claim de novo.  *Pirtle*, 313 F.3d at 1167.

The Ninth Circuit has delineated the clearly established Supreme Court law bearing upon a judicial bias claim:

> The Supreme Court has long established that the Due Process Clause guarantees a criminal defendant the right to a fair and impartial judge.  *See In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955).  To succeed on a judicial bias claim, however, the petitioner must "overcome a presumption of honesty and integrity in those serving as adjudicators." *Withrow v. Larkin*, 421 U.S. 35, 47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975).  In the absence of any evidence of some extrajudicial source of bias or partiality, neither adverse rulings nor impatient remarks are generally sufficient to overcome the presumption of judicial integrity, even if those remarks are "critical or disapproving of, or even hostile to, counsel, the parties, or their cases." *Liteky v. United States*, 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994); *see United States v. Martin*, 278 F.3d 988, 1005 (9th Cir.2002).

*Larson v. Palmateer*, 515 F.3d 1057, 1067 (9th Cir. 2008).

"When the question of the propriety of the trial judge's conduct is raised in a habeas action, the inquiry is 'whether the state trial judge's behavior rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution." *Macky v. Scribner*, 2010 WL 334474 at *13 (9th Cir. 2010) (quoting *Ducket v. Godinez*, 67 F.3d 734, 740 (9th Cir. 1995)).[10]

---

[10]  Ninth Circuit Rule 36-3(b) permits the citation of unpublished dispositions and orders to the courts of the circuit.  *See* Circuit Rule 36-3(b).

1      a. *Shackling, Excessive Security Measures and Denial of Defense Access to Documents*

2      *Supporting Security Measures*

3      Buchanan claims the state trial judge's decision to shackle him during the trial, the "excessive"

4  security measure employed during trial, and the judge's denial of defense access to the evidence used

5  to support the judge's decisions evidenced bias against him.  (Pet. at 10, ECF No. 40; Attach. C. at 13,

6  ECF No. 40-1; Traverse at 19, ECF No. 77.)  Before trial began, defense counsel filed a motion seeking

7  to limit the security measures, including the shackling of Buchanan, that would be implemented during

8  the trial.  (Lodgment No. 23, vol. 3 at 698-711.)  The trial judge held a brief hearing on the matter and

9  ruled as follows:

10          THE COURT: It's my understanding that the sheriff's department here has a
       standing order that they must have two deputies available for every green-bander.  All
11     three clients fit in that category.  So I'm saddled with their policy and procedure that I
       have to have at least six people present.

12
           At this point in time, I think I'm going to limit it to seven, two of which, it's my
13     understanding, will not be inside the courtroom anyway.  I will coordinate that with my
       own bailiff on that issue.

14
           The motion, in essence, will be granted.  There will be a limit.  I'll place it at this
15     point at seven.

16                                          . . . .

17          There are a series of bolts on the floor.  All three defendants will be bolted to the
       floor.  No defendant will be shackled as far as their hands are concerned.  They will be
18     simply — there will be an ankle, plastic-coated-chain affair that makes it virtually
       impossible for anyone to hear that a person is chained.  It's extremely difficult to see that
19     anyone is chained.  They are free to assist counsel, to take notes, to handle exhibits and
       papers and assist you throughout the entire trial.  That's my tentative ruling with regard
20     to restraints.

21                                          . . . .

22          The law requires that I go through and make determinations, specifically findings
       as to each defendant the necessity to have physical restraints.

23
           I have received certain information, as I've indicated to you, that I will include
24     in a sealed document for purposes of appellate review.  Some of it I do feel is classified,
       confidential, could put people at risk.  The vast majority, however, is not.

25
           We'll start first with Mr. Buchanan.

26
           The information I have from the Sheriff's Department is that Mr. Buchanan has
27     a series of incidents involving confrontations with staff.  That he's been involved with
       incidents receiving contraband through the mail.  He's been involved with assaults on
28     other inmates.  He has two prior instances of potential or possible escapes.  He's

1   classified as a level 6 maximum assaultive escape risk.  He has certainly numerous
    priors, although they in and of themselves cannot serve as a basis.  I think certainly the
2   court has to consider whether or not Mr. Buchanan has a violent tendency.  It would
    appear that he does.
3
            There's additional materials, as I indicated, that will be part of the sealed order
4       from the court.

5   (Lodgment No. 27, vol. 3 at 169-72.)

6       Buchanan's lawyer objected to his lack of access to the sealed information and the possibility

7   that jurors could see the chains.  (*Id.* at 174-75.)  Defense counsel also asked that if the defendants were

8   not permitted to stand when the jury entered for security reasons, that all parties be prevented from

9   standing.  (*Id.* at 176-77.)  The judge  indicated there would be a curtain blocking any view of the ankle

10  chains, and granted the defense request to prevent all parties from standing if defendants were not

11  permitted to stand.  (*Id.* at 175-77.)

12      The Court has reviewed the sealed order regarding the courtroom security and shackling, as well

13  as the information upon which the judge relied to make his decision, which are contained as Exhibits

14  one through two of the habeas corpus petition Buchanan filed in the state appellate court on March 28,

15  2010. (Lodgment No. 12, Exs. 1-2.)  The information consists of a letter dated February 28, 2006, from

16  the San Diego County Sheriff's Department detailing the need for the use of restraints during trial based

17  on "numerous incidents of disobeying and disrespecting staff, receiving contraband via legal mail, and

18  assaults on other inmates."  (*Id.*, Ex. 1.)    The letter is followed by an incident report from March of

19  2005, in which Buchanan was overheard telling his cellmate that because leg chains had not placed on

20  him, it would have been easy to escape through an open gate while being transported.  (*Id.*)  The letter

21  and the incident report also list Buchanan as a "high-ranking EME prison gang member" who "has

22  several convictions for prison escapes in his criminal history."  (*Id.*)  In its order directing the use of

23  restraints, the trial judge stated that Buchanan would have a plastic leg chain that would not make any

24  sounds and would be concealed by a table drape.  (*Id.*, Ex. 2.)  The judge indicated he had reviewed "the

25  criminal records of each defendant as well as documentation provided to the Court by the Sheriff's

26  Department outlining each defendant's actions while in local custody."  (*Id.*)  He reiterated the

27  information from the Sheriff's Department letter and incident report as support for his decision.  (*Id.*)

28  / / /

The record does not reflect judicial bias against Buchanan.  To the contrary, the judge relied on sufficient, verified information given to him by the Sheriff's Department.  He thoughtfully considered the information he was provided and granted both the request to limit the number of security personnel in the courtroom and the request to either permit the defendants to stand or require that everyone stay seated.  The judge also made various accommodations, such as the use of a curtain to obscure the ankle chains, the use of plastic coated chains to deaden any noise from the chains, and did not require Buchanan and the other defendants to have their arms chained in any fashion.  In short, the judge properly and fairly balanced the need to ensure courtroom security with Buchanan's right to fair trial. There is nothing in the record before this Court that establishes "the state trial judge's behavior rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution." *Ducket*, 67 F.3d at 740.[11]

b.  *Reference to Buchanan "Pimping" Defense Counsel and Reference to the Jury as "Idiots"*

Buchanan next claims the trial judge was biased because he said Buchanan was "pimping" his defense attorney and referred to the jury as "idiots."  (Attach. C at 13, ECF No. 40-1.)  As to the first allegation, Buchanan is presumably referring to the following exchange between the judge and counsel regarding jury instructions:

[PROSECUTOR]: I think everything else comes out.

THE COURT: All the way through?

[PROSECUTOR]: Yes.  Defense is in momentary possession or justifiable possession, unless [defense counsel] is advancing one of those.

[COUNSEL FOR PARRAZ]: Momentary, just slipped into his skivs.

THE COURT: I'm surprised he hasn't pimped you to do that.

[COUNSEL FOR BUCHANAN]: Actually, he has.

(Lodgment No. 34, vol. 10 at 1352.)

/ / /

/ / /

---

[11]  The propriety of the use of shackling and other security measures is addressed in Section IV(B)(7) of this R&R.

While perhaps injudicious, it is clear from the record that the judge's comment was a simply an attempt at humor, made to lawyers who frequently appear in his courtroom. It was not part of a pattern of delegitimizing or belittling Buchanan or his attorney which would indicate bias.

As to Buchanan's allegation that the judge referred to the jury as "idiots," Buchanan has not pointed the Court to any pages of transcript where this reference occurred, and the Court is unable to locate anywhere in the transcript where such an event occurred. Even if it did occur, however, it is unclear how this would translate into bias against Buchanan. Therefore, Buchanan has not established "the state trial judge's behavior rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution." *Ducket*, 67 F.3d at 740.

c. *Permitting Two Gang Experts to Testify*

Buchanan argues the trial judge's decision to permit two gang experts to testify shows he was biased against him. (Attach. C at 13, ECF No. 40-1.) Buchanan claims the experts simply corroborated and repeated each other's testimony and "demonized" him. (*Id.*)

Buchanan filed a pretrial motion to limit the number of gang experts. At the hearing on the motion, the trial judge asked the prosecutor whether he was presenting "different gang experts who are going to testify to different things," and stated that "[if] they are going to testify to the same thing, why should I let you call two?" (Lodgment No. 30, vol. 6 at 348.) The prosecutor explained that the first expert, Steve Contreras, was a CDCR representative who would testify about "the history, formation, his expertise in the Mexican Mafia, his experience interviewing Mexican Mafia members, and his experience in both the prison system and outside the prison system," and that he had "specific knowledge of Mr. Buchanan [and would] be able to render an opinion that Mr. Buchanan is a member of the Mexican Mafia." (*Id.* at 349.) The second expert, Detective Mike Gutierrez with the San Diego Police Department, "had specific knowledge of this case," and "wide reaching knowledge of the relationship between Surenos and the Mexican Mafia." (*Id.*) He would "testify as to two predicate acts as required by the statute to prove the allegation under Penal Code section 186.22 [the "for the benefit of a street gang" enhancement]." (*Id.*)

At trial, Contreras, testified generally about prison life, classification of prisoners, the conditions in certain housing units of prisons, and prison gangs. (Lodgment No. 30, vol. 6 at 365-90.) Contreras

1   also testified about the Mexican Mafia specifically — where and how it was born, how it is organized,

2   the rules governing the organization, terms used by members and their meanings, how many Mexican

3   Mafia members there are on the streets and in prison, how prison officials "validate" a Mexican Mafia

4   member,[12] and what criminal activities the Mexican Mafia is engaged in, both in prison and on the

5   streets.  (*Id.* at 365-428.)  Contreras also specifically identified Buchanan as a member of the Mexican

6   Mafia and a "Big Homie," i.e., a controlling member of the Mexican Mafia.  (*Id*. at 409, 414-15.)

7   Gutierrez testified about his contact and experience with Mexican Mafia members on the street and

8   specifically gave his opinion as to whether the crimes committed against Torres were for the benefit of

9   the Mexican Mafia, as alleged in the information.  (Lodgment No. 33, vol. 9 at 1177-1210.)

10   Although there was some overlap between the two experts with regard to Mexican Mafia

11   members' activities on the street, Contreras and Gutierrez had expertise in distinct areas that were

12   relevant to the prosecution's case.  (*See* Lodgment No. 30, vol. 6 at 348-49.)  In addition, the trial judge

13   did not blindly agree to the prosecution's request to call two gang experts, but rather questioned the

14   prosecutor as to why he needed both.  (*Id.* at 348.)  Thus, the record does not reflect a judge who was

15   biased against Buchanan and whose "behavior rendered the trial so fundamentally unfair as to violate

16   federal due process under the United States Constitution."  *Ducket*, 67 F.3d at 740.

17   d. *Inaction Regarding Disputed Translation of Wiretapped Phone Calls*

18   Buchanan contends the trial judge showed bias when he failed to take any action regarding the

19   disputed translation of the wiretapped phone calls.  (Attach. C at 13-14, ECF No. 40-1.)  Buchanan also

20   notes that after his conviction, the prosecutor stipulated to a different version of the transcripts of the

21   wiretapped phone calls in Rodney Brooks' trial which did not contain the disputed translations.  (*Id.* at

22   14.)

23   The issue of whether the translations of the wiretapped phone calls was accurate was discussed

24   several times over the course of the state court proceedings.  It was first discussed on March 26, 2006,

25   at a pretrial motions hearing.  At that time, Rodney Brooks, who was representing himself, alleged that

26   the transcripts were inaccurate.  (Lodgment No. 29, vol. 5 at 297-99.)  The trial judge told Brooks

27   _____

28   [12] A "validated" Mexican Mafia member is a person who has been determined, through various criteria, to belong to the Mexican Mafia and hold a certain amount of power within that organization.  (*See* Lodgment No. 30, vol. 6 at 403-04.)

"[t]here's nothing to prohibit you from bringing that expert in your case in chief saying this is what the correct interpretation of this is."  (*Id.* at 299.)

Buchanan next brought the issue up on April 18, 2006, during trial.  Defense counsel told the judge that Buchanan wanted to put on the record his request for an independent review of the translations of the wiretapped phone calls.  Counsel noted that he had had an investigator review the transcripts, who told counsel they were accurate, but that, upon reflection, there were some changes to two of the transcripts that should be made.  (Lodgment No. 34, vol. 10 at 1311.)  Counsel provided the prosecutor with corrected transcripts of the two calls, and noted that they had not had a chance to discuss any changes or come to an agreement.  (*Id.* at 1311-12.)  In response, the trial judge told defense counsel:

> THE COURT: If you can't agree, you are going to have to call an expert on behalf of the defense, or whoever your interpreters were that reviewed it, to say that they believe that's what this means.
>
> You can submit, potentially, a supplemental page and have that marked as an exhibit.  If your expert says this is what we think its should say, that may go in conjunction with the transcripts marked by the people.

(*Id.* at 1312.)

The following day, April 19, 2006, counsel were prepared to submit a modified version of the transcripts at issue.  The trial judge and counsel discussed how to best present the modified transcripts to the jury, and agreed to simply substitute the new transcripts for the old.  (*Id.* at 1318-21.)

The next time the transcript issue was discussed was April 27, 2006, following Buchanan's conviction.  At that time, Buchanan complained his attorney had not submitted altered transcripts for two of the phone calls relied on by the prosecution at trial.  (Lodgment No. 35, vol. 11 at 1622-23.)  The trial judge listened to Buchanan, and defense counsel indicated he intended to raise the issue of the transcripts in a post trial motion.  (*Id.* at 1623.)  Finally, on March 16, 2007, Buchanan's new attorney argued in her motion for a new trial that trial counsel was ineffective for failing to submit alternate transcripts of the phone calls; the trial judge denied the motion, stating that while the altered translations may have had some effect on Buchanan's case, it would not have likely altered the outcome.  The judge also found the transcript issues would have come down to a "battle of the experts," and that counsel simply made a tactical decision not to pursue that line of defense.  (*Id.* at 1679-80.)

As with Buchanan's preceding claims of judicial bias, there is simply no evidence in the record that the judge treated Buchanan, his attorney and the defense theories and evidence with anything but respect and consideration.  Moreover, it was the responsibility of counsel, not the trial judge, to address any reliability issues with regard to the transcripts.  There is simply no evidence the judge was biased against Buchanan with regard to the transcript issue, and no evidence his "behavior rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution." *Ducket*, 67 F.3d at 740.

e. *Denial of Buchanan's Marsden Motions*

Buchanan also complains that the trial judge's denial of his *Marsden* motions is evidence of judicial bias.  (Attach. C. at 14-15, ECF No. 40-1.)  The Court has reviewed the sealed *Marsden* hearing transcripts.  At each hearing, the trial judge listened thoughtfully and respectfully to Buchanan's complaints before denying the motion.  As previously noted, "[i]n the absence of any evidence of some extrajudicial source of bias or partiality . . . adverse rulings . . . are generally [in]sufficient to overcome the presumption of judicial integrity . . . ." *Larson*, 515 F.3d at 1067 (citing *Liteky v. United States*, 510 U.S. at 555).  On the record before this Court, Buchanan has not established the denial of his *Marsden* motions was motivated by judicial bias or that his "behavior rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution." *Ducket*, 67 F.3d at 740.

f. *Failure to Admonish or Caution the Jury After They Saw Buchanan in Shackles*

Buchanan contends the trial judge was biased because he did not admonish or caution the jury after members saw him in shackles.  (Attach. C. at 15, ECF No. 40-1.)  Buchanan is presumably referring to an incident which took place on April 18, 2006, during trial proceedings.  Parraz informed his counsel, who informed the court, that he and Buchanan were observed by jurors as they were being led into the courtroom.  (Lodgment No. 34, vol. 10 at 1214.)  Buchanan and Parraz were shackled.  (*Id.*)  When asked by the judge, one bailiff said that he had been escorting the defendants and had not seen any jurors.  A second bailiff confirmed this.  (*Id.* at 1214-15.)  The trial judge stated that he would speak to all the security personnel involved in transporting Buchanan and Parraz to make sure no one had seen them in shackles and to ensure that "something like that doesn't happen again, if it happened at all." (*Id.* at 1215.)  No further discussions on the record appear to have occurred.

Again, Buchanan has not provided any evidence the judge was biased against Buchanan, and no evidence his "behavior rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution." *Ducket*, 67 F.3d at 740. To the contrary, the judge said he would investigate whether any jurors had seen Buchanan while he was shackled and committed to ensuring any such sightings did not happen again. That the judge did not caution the jury is simply an indication that he concluded no juror had seen Buchanan in shackles, or he decided that any admonishment would only draw more attention to the shackling. Buchanan has not established the judge was biased against him, nor that his "behavior rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution." *Ducket*, 67 F.3d at 740. He is not entitled to relief as to this claim.

g. *Refusal to Permit Defense Counsel to Contact Jurors After the Verdict and Decision*
*to Sever Co-Defendant Brooks and Grant Him a Continuance*

Buchanan next complains about two rulings made by the trial judge. First, he argues the judge's refusal to disclose jurors' contact information establishes he was biased against Buchanan. (Attach. C. at 15, ECF No. 40-1.) After Buchanan was convicted, the trial judge appointed a new attorney to research and present a motion for a new trial. (Lodgment No. 36, vol. 12 at 1640-43.) Among other motions, counsel filed a motion to disclose the names of jurors who completed the juror questionnaires during voir dire. The motion was brought in order to provide a factual basis for a motion for a new trial based on the ground that Buchanan was denied his federal constitutional right to be tried by a jury drawn from a source representative of the community. (Lodgment No. 24, vol. 4 at 0774-77.) A hearing on the motion was held on February 22, 2007. The judge denied the motion as follows:

> THE COURT: As to the issues regarding the jury questions, the motion for disclosure of the panel members, the motion for a new trial based on constitutional infirmities, denied.
>
> As to the disclosure of the names of the jury pool, the court offers the following: there's absolutely no evidence before this court in this case to suggest that there was any constitutional infirmity as to the selection process for the Garcia/Parraz jury. There's no evidence that's been presented in this case to this court that was not in existence at the time of the selection of this panel that was available had that evidence been pursued.
>
> There's no evidence in our case with regard to the panel picked for these gentlemen that shows any type of underrepresentation or any type of systematic exclusion of a cognizable group in the process. The defendants have not presented evidence in our case that any cognizable group was excluded from the jury selection

1   process nor that any such group is in fact a distinct group within our community.

2         There's no evidence to indicate that any cognizable group has been defined.
    Nothing to indicate that the jury trial for these gentlemen in our case was not fair and
3   reasonable.

4         To the extent there was any underrepresentation, if that's determined to have
    taken place, there's absolutely no evidence in our case to suggest that any type of
5   systematic exclusion suggests any type of constitutional violation.

6         Further, no objection was made to the composition of the panel prior to the panel
    being sworn in our case, as required under C.C.P. [California Civil Procedure] 225.
7

8         Further, the panel make-up was clearly acceptable to trial counsel as they
    exercised only 21 peremptory challenges, leaving nine remaining peremptory challenges
    unexercised.
9

10        Based upon those facts, the motions that the two of you have brought on the jury
    selection issue are denied.

11  (Lodgment No. 36, vol. 12 at 1652-53.)

12        Buchanan also contends the trial judge's decision to sever Brooks from the case and grant him

13  a continuance is evidence of judicial bias.  (*Id.*.)  At a hearing on motions following the granting of

14  Brooks' request to represent himself, Brooks asked for a continuance in order to secure several records,

15  interview some witnesses and file motions that required a certain amount of notice.  (Lodgment No. 29,

16  vol. 5 at 268-310.)  Counsel for Buchanan belatedly joined in the motion, noting that he had not received

17  fingerprint evidence or transcripts of interviews with Chavez.  (*Id.* at 287-90.)  The trial judge noted that

18  he had ordered the prosecutor to turn over those items, but that this did not form the basis for a

19  continuance because it was not clear whether such items even existed.  (*Id.*)  If they did exist, and there

20  was a delay in providing them, the court agreed to consider that at a later date.  At that time, however,

21  the court said a continuance for Buchanan and Parraz was premature.  (*Id.*)  Following a lengthy

22  discussion and argument about Brooks' request for a continuance, the trial judge agreed that Brooks had

23  established good cause for a continuance, in large part due to Brooks' recent decision to represent

24  himself, and granted the motion as to Brooks.  The judge denied the motion as to Buchanan and Parraz

25  and severed Brooks' case.  (*Id.* at 307-11.)

26        As previously noted, "[i]n the absence of any evidence of some extrajudicial source of bias or

27  partiality . . . adverse rulings . . . are generally [in]sufficient to overcome the presumption of judicial

28  integrity . . . ."  *Larson*, 515 F.3d at 1067 (citing *Liteky*, 510 U.S. at 555).  The judge's decision to deny

1   the motion to disclose juror information was based on his determination that there was insufficient

2   evidence to support an motion to challenge the make up of the jury pool.  The judge's decision to grant

3   Brooks' motion to continue was based on the fact that Brooks' decision to represent himself required

4   additional time for preparation.  On the record before this Court, Buchanan has not established that

5   denying the motion for disclosure of jurors information or granting Brooks' request for a continuance

6   and severing him from Buchanan's and Parraz's case were motivated by judicial bias, nor has he shown

7   the judge's "behavior rendered the trial so fundamentally unfair as to violate federal due process under

8   the United States Constitution."  *Ducket*, 67 F.3d at 740.  Accordingly, he is not entitled to relief as to

9   these claims.

10      h.  *Coaching a Witness at the Suppression Motion Hearing*

11      Buchanan argues the judge exhibited bias when he "told the witness what to say" at the hearing

12   on the motion to suppress evidence.  (Attach. C at 16, ECF No. 40-1.)  Buchanan appears to be referring

13   to the following exchange between defense counsel, the prosecutor, the trial judge and Officer McIvor:

14      Q [DEFENSE COUNSEL]: So you and the other officers immediately, to save
        Triste's life, entered the house, or at least knocked on the door, true?

15

16      MR. BOST: Objection. Argumentative.

17      THE COURT: Overruled.  He can say that's not what they did.

18      THE WITNESS: That's not what we did.  I know that another phone call was
        made from Mr. Buchanan to Ms. Chavez that indicated that Mr. Triste has not been
        harmed at that time.

19

20   (Lodgment No. 27, vol. 3 at 102.)

21      This exchange does not establish judicial bias.  The trial judge was explaining the basis for

22   overruling the prosecutor's objection, i.e., the question was not argumentative *because* McIvor could

23   simply answer that that is not what they did.  Further, it is clear from the totality of the McIvor's

24   testimony that the judge's comment did not direct or in any way affect his McIvor's testimony.  As with

25   Buchanan's preceding claim, "[i]n the absence of any evidence of some extrajudicial source of bias or

26   partiality . . . adverse rulings . . . are generally [in]sufficient to overcome the presumption of judicial

27   integrity . . . ."  *Larson*, 515 F.3d at 1067 (citing *Liteky*, 510 U.S. at 555).  Buchanan has not established

28   the judge's comment was motivated by judicial bias, nor has he shown the judge's "behavior rendered

1  the trial so fundamentally unfair as to violate federal due process under the United States Constitution."

2  *Ducket*, 67 F.3d at 740.

3      i.  *Speculation Regarding Prosecution's Justification for the Stop of Buchanan's Car*

4      Buchanan's final claim regarding judicial bias relates to comments the judge made about the

5  reasons the prosecution put forth as justification for the stop of his car.  (Attach. C at 16, ECF No. 40-1.)

6  This claim stems from comments made during the argument portion of the hearing on the motion to

7  suppress evidence.  The argument made by defense counsel at the motion to suppress was that police

8  concern about the welfare of Triste was simply a pretext to stop Buchanan's car and search him.

9  (Lodgment No. 27, vol. 3 at 126-27.)  The trial judge asked defense counsel why all of the information

10  known to the officers before stopping Buchanan's car, including all of the information gleaned from the

11  wiretaps, could not be used to provide the probable cause for the stop.  (*Id.* at 127-28.)  Defense counsel

12  replied that the information from the wiretaps had never been advanced by the prosecution as a basis

13  for the stop, and that, should the prosecutor wish to do so, he wanted more time to respond.  (*Id.* at 128-

14  31.)  The prosecutor told the judge he had, in fact, advanced the theory that probable cause was based

15  in part on the information gleaned from the wiretaps.  (*Id.* at 132.)  The judge denied the motion.  (*Id.*

16  at 132.)

17      The record does not support an inference of bias on the part of the state trial judge.  At the

18  hearing, the trial judge stated the proper standard for deciding the motion to suppress:  "[T]he question

19  for me based upon all the evidence that's been presented to me, is [whether there is] p.c. [probable

20  cause] to stop the car[.]" (*Id.* at 130.)  As the Ninth Circuit has noted:

21          The Supreme Court has made clear that an officer's subjective thoughts play no
            role in the Fourth Amendment analysis.  *Whren v. United States*, 517 U.S. 806, 811-12
22          [citations omitted] (1996).  More specifically, the fact that officers acted on one rationale
            "would not foreclose the [government] from justifying [the search] by proving probable
23          cause.  *Florida v. Royer*, 460 U.S. 491, 501 [citations omitted] (1983); *United States v.
            Willis*, 431 F.3d 709, 715 (9th Cir. 2005) (*Whren* stands for the proposition that if the
24          officers have probable cause to believe that a traffic violation occurred, the officers may
            conduct a traffic stop even if the stop serves some other purpose.")  Thus, it does not
25          matter that [the officer] was directed to make a "traffic stop," nor does it matter whether
            he had valid grounds to make the traffic stop because of lane-straddling.  If the officers
26          had probable cause, then the seizure and search of the vehicle will be justified.

27  *United States v. Ramirez*, 473 F.3d 1026, 1030-31 (9th Cir. 2007).

28      Accordingly, Buchanan has provided no evidence that the judge's ruling was the result of bias.

1   As with Buchanan's other claims attacking the state judge's rulings, "[i]n the absence of any evidence

2   of some extrajudicial source of bias or partiality . . . adverse rulings . . . are generally [in]sufficient to

3   overcome the presumption of judicial integrity . . . ." *Larson*, 515 F.3d at 1067 (citing *Liteky*, 510 U.S.

4   at 555).  He is not entitled to relief as to this claim.

5        j. *Conclusion*

6        Buchanan has not established, either individually or collectively, that the state trial judge was

7   biased against him because he has not shown the judge's "behavior rendered the trial so fundamentally

8   unfair as to violate federal due process under the United States Constitution."  *Ducket*, 67 F.3d at 740.

9        7.   *Excessive Security and Shackling (Claim Six)*

10       In claim six, Buchanan contends that his federal due process rights were violated by the

11  excessive security employed in the courtroom during his trial and by his shackling.  (Pet. at 11, ECF No.

12  40; Attach. C at 17-18, ECF No. 40-1; Traverse at 19-22, ECF No. 77.)  Specifically, he complains: (1)

13  there was a full sized, temporary metal detector and five to ten armed sheriff's deputies outside the

14  courtroom; (2) there were groups of federal agents, "SWAT-style clad California Department of

15  Corrections and Rehabilitation transportation officers" and other security personnel in the courtroom;

16  (3) a bomb-sniffing dog was brought into the courtroom; and (4) jurors were allowed to view Buchanan

17  in leg and waist chains and being escorted by armed guards.  (Pet. at 11, ECF No. 40; Attach. C. at 17-

18  18, ECF No. 40-1; Traverse at 19-22, ECF No. 77.)  Buchanan claims the jury asked for an armed escort

19  out of the building following the verdict.  (Attach C. at 18, ECF No. 40-1.)  Because it is unclear

20  whether this claim is procedurally defaulted, the Court will analyze this claim de novo.  *Pirtle*, 313 F.3d

21  at 1167.

22       a. *Excessive Security*

23       In *Hayes v. Ayers*, the Ninth Circuit framed the inquiry regarding courtroom security in the

24  following way:

25          *Holbrook v. Flynn*, 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986) . . .
            establishes the framework for analyzing whether courtroom security measures violate
26          a defendant's right to a fair trial. We must first "look at the scene presented to jurors and
            determine whether what they saw was so inherently prejudicial as to pose an
27          unacceptable threat to defendant' right to a fair trial."  *Holbrook*, 475 U.S. at 572, 106
            S.Ct. 1340.  In assessing inherent prejudice, the question is "whether an unacceptable
28          risk is presented of impermissible factors coming into play" in the jury's evaluation of
            the defendant. *Id.* at 570, 106 S.Ct. 1340 (internal quotation marks omitted). If security

1  measures are not found to be inherently prejudicial, a court then considers whether the
2  measures actually prejudiced members of the jury. *Id.* at 572, 106 S.Ct. 1340. "[I]f the
   challenged practice is not found inherently prejudicial and if the defendant fails to show
   actual prejudice, the inquiry is over." *Id.*
3

4  *Hayes v. Ayers*, 632 F.3d 500, 521-22 (9th Cir. 2011).

5          As the state trial judge noted, Sheriff's Department regulations required two officers for each

6  defendant.  Before Brooks was severed from the case, this meant a minimum of six deputies had to be

7  present in the courtroom during trial. (Lodgment No. 27, vol. 3 at 169-70.)  The trial judge limited the

8  number to seven maximum, with two of the seven deputies outside the courtroom.  There is no

9  indication as to how many deputies were present in the courtroom once Brooks was severed from the

10  case, but the Court assumes that, based on the logic of the judge's previous order, there were a

11  maximum of five deputies permitted.  Buchanan alleges there were "groups of radio wired/carrying

12  suited federal agents" and "task force related personnel" seated in in the gallery as well.  (Pet. at 11,

13  ECF No. 40; Attach. C at 17-18, ECF No. 40-1.)

14          The Supreme Court in *Holbrook* found that the presence of four uniformed state troopers was

15  not inherently prejudicial. *Holbrook*, 475 U.S. at 569.  Applying *Holbrook*, the Ninth Circuit has found

16  that the deployment of security measures and personnel similar to that deployed in Buchanan's case was

17  not inherently prejudicial.  *See Hayes*, 632 F.3d at 521-22 (finding that three extra deputies, personal

18  screening of spectators, including the use of a hand-held metal detector, patting down of outer clothing,

19  inspection of bags, and locking the courtroom door was not inherently prejudicial); *Williams v.*

20  *Woodford*, 384 F.3d 567, 587-90 (9th Cir. 2004) (finding that the presence of four marshals in the

21  courtroom was not inherently prejudicial); *Ainsworth v. Calderon*, 138 F.3d 787, 797 (9th Cir. 1998)

22  (finding that the presence of four and sometimes six armed sheriff's deputies at trial, two of whom sat

23  behind each defendant during trial, was not inherently prejudicial).  As to the alleged presence of bomb-

24  sniffing dogs, there is no evidence the jury witnessed the dogs.

25          Buchanan has also not established actual prejudice from the presence of excessive security.  The

26  evidence Buchanan presents to support a finding of actual prejudice is his allegation that jurors

27  expressed a concern for their safety and asked for an armed escort out of the building.  The jury did send

28  a note out from deliberations indicating they had reached a verdict, expressing concern about the

1  confidentiality of their personal information and safety.  The note read as follows:

2       There is concern in the jury room as to the amount of personal information the
        defendants were able to obtain/see regarding the jurors (i.e. the questionnaire).

3

4       Should there be any concern for our personal safety (some of us were asked
        questions in front of the defendants)?

5       And, we have reached verdicts on all counts.

6

7  (Lodgment No. 23, vol. 3 at 0568.)

8       The only reference in the record to the jury's request for an armed escort out of the building is

9  found in defense counsel's motion for a new trial.  (Lodgment No. 24, vol. 4 at 0753.)  The Court has

10 been unable to locate any evidence in trial record that jurors made such a request.

11      As Respondent has pointed out, Buchanan has not presented any evidence of actual prejudice,

12 such as declarations or other evidence from jurors, that establishes the jury was prejudiced against

13 Buchanan as a result of seeing the security in the courtroom.  Although the jury expressed concern for

14 their safety following the verdict, this, by itself, is insufficient to establish that the jury's verdict was

15 affected by the security visible in the courtroom.  *Hayes*, 632 F.3d at 521-22.

16      b.  *Shackling*

17      "[A] defendant has the right to be free of shackles and handcuffs in the presence of the jury,

18 unless shackling is justified by an essential state interest."  *Ghent v. Woodford*, 279 F.3d 1121, 1132 (9th

19 Cir. 2002).   A shackling error, however, is subject to the harmless error analysis of *Brecht v.*

20 *Abrahamson*, 507 U.S. 619 (1993), that is, a petitioner must show the error had a "substantial and

21 injurious effect or influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 623.  "When the jury

22 never saw the defendant's shackles in the courtroom . . . the shackles did not prejudice the defendant's

23 right to a fair trial.  *Williams v. Woodford*, 384 F.3d 567, 592-93 (9th Cir. 2004) (citing *Castillo v.*

24 *Stainer*, 997 F.2d 669, 669 (9th Cir. 1993)).  "[T]he unconstitutional shackling of a defendant results

25 in prejudice only if the evidence of guilt is not "overwhelming."  *Cox v. Ayers*, 613 F.3d 883, 891 (9th

26 Cir. 2010).

27      As previously discussed, defense counsel filed a motion for Buchanan to appear without

28 restraints, and, relying on information provided by the Sheriff's Department, the judge decided the

1    defendants would be bolted to the floor with plastic leg chains that did not make noise and were hidden

2    by a skirt around defense table.  There would be no chains on their hands.  (Lodgment No. 27, vol. 3 at

3    172.)  The information the court relied on, which consisted of incident reports and Buchanan's criminal

4    history, and the sealed order it issued are contained as Exhibits one through two of the habeas corpus

5    petition Buchanan filed in the state appellate court on March 28, 2010.  (Lodgment No. 12, Exs. 1-2;

6    *see also* this R&R at section IV(B)(7)(a).)

7           The trial judge's decision was reasonable and supported by specific factual allegations that

8    justified the use of restraints.  But, even if the judge's decision was wrong, Buchanan has not established

9    prejudice under *Brecht*.  The Ninth Circuit has held that leg chains on a defendant constitute harmless

10   error where, as here, a curtain around the defense table concealed them and there is no evidence the jury

11   ever saw the defendant's shackles in the courtroom.  *See Williams*, 384 F.3d at 593-94 (citing *Castillo*

12   *v. Stainer*, 997 F.2d 669, 669 (9th Cir. 1993) (finding harmless error in shackling where the waist chain

13   on defendant would not be seen by the jury); *Packer v. Hill*, 291 F.3d 569, 583 (9th Cir. 2002) (finding

14   no prejudice resulted from shackles when no juror interviewed remembered seeing the shackles); *Rich*

15   *v. Calderon*, 187 F.3d 1064, 1069 (9th Cir. 1999) (finding no prejudice from shackling where a curtain

16   concealed ankle chains); and *United States v. Collins*, 109 F.3d 1413, 1418 (9th Cir. 1997) (same)).

17          Buchanan also claims jurors saw him in shackles, waist chains and cross-cuffed while being

18   transported to court.  (Attach. C. at 17-18, ECF No. 40-1.)  In *Williams*, the Ninth Circuit noted that "a

19   jury's brief or inadvertent glimpse of a defendant in physical restraints outside of the courtroom does

20   not warrant habeas relief unless the petitioner makes an affirmative showing of prejudice."  *Williams*,

21   384 F.3d at 593 (citing *Ghent*, 279 F.3d at 1133 (holding a jury's occasional, brief glimpses of defendant

22   in restraints in the hallway before court was not prejudicial); *United States v. Olano*, 62 F.3d 1180, 1190

23   (9th Cir. 1995) (same); *United States v. Halliburton*, 870 F.2d 557, 560-62 (9th Cir. 1989) (same)).  As

24   with his excessive security claim, the only evidence Buchanan presents to support a finding of actual

25   prejudice is his allegation that jurors expressed a concern for their safety in a note and asked for an

26   armed escort out of the building.  Buchanan has not presented any declarations or other evidence from

27   jurors that would establish the jury was prejudiced against Buchanan as a result of briefly seeing him

28   in shackles.  Accordingly, he is not entitled to relief as to this claim.

8.     *Prosecutorial Misconduct (Claim Seven)*

Buchanan contends the prosecutor committed misconduct in several ways.  He claims: (1) the prosecutor purposefully gave the defense an old parole detail record on Torres in an attempt to conceal the fact that Detective McIvor knew the individual in the car with Buchanan was Torres and to facilitate McIvor's claim that he stopped Buchanan's car because he believed Jesse Gutierres, a parolee at large, was the passenger in the car; (2) the prosecutor and law enforcement used coercive and suggestive questioning to "coach" from and "feed" information to witnesses; (3) unlike other witnesses and suspects interviewed in the course of the investigation, there was no transcribed interview of Torres, which indicates Torres was an FBI recruit which was not disclosed to the defense; (4) the prosecutor withheld wiretap information by failing to give the defense a copy of a transcript of a phone call between Jessica Chavez and Detective Gutierrez, failing to provide "all the discovery required by law" as he claimed, falsely telling the trial court that there were no recordings of any interviews with suspects and witnesses in the case and giving the defense a large envelope of CD recordings at the close of the prosecutions' case; (5) the prosecutor falsely claimed he would present a Spanish language expert at trial to verify the translations of the wiretapped phone calls were accurate; (6) Agent Desarno intimidated witnesses into not speaking with defense investigators; (7) the prosecutor made false statements during closing argument; (8) the prosecutor referred to Buchanan's cell phone, which law enforcement had provided, as a tool used by drug dealers to further their drug dealing activities; (9) law enforcement had an undisclosed wiretap on Ernesto Torres before August 24, 2005, and evidence of this wiretap was not disclosed; and (10) Buchanan was prejudiced by the cumulative effect of this misconduct.  (Pet. at 12, ECF No. 40; Attach. C. at 19-23, ECF No. 40-1; Traverse at 22-24, ECF No. 77.)  Buchanan also alleged trial and appellate counsel were ineffective for failing to raise these claims at trial and on appeal, respectively.  (Attach. C at 23, ECF No. 40-1.)  Ineffective assistance of trial and appellate counsel claims are addressed in section IV(B)(10) and (11) of this R&R, *infra*.  Because it is unclear whether this claim is procedurally defaulted, the Court will analyze this claim de novo.  *Pirtle*, 313 F.3d at 1167.

"[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."  *Smith v. Phillips*, 455 U.S. 209, 219 (1982).  "It is not enough that the prosecutor's remarks were undesirable or even universally condemned."

1   *Darden*, 477 U.S. at 181.   Rather, a prosecutor commits misconduct when his or her actions "'so

2   infect . . . the trial with unfairness as to make the resulting conviction a denial of due process.'"   *Id.*

3   (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974).)   "Moreover, the appropriate standard of

4   review for such a claim on writ of habeas corpus is 'the narrow one of due process, and not the broad

5   exercise of supervisory power.'"   *Id.* (quoting *Donnelly*, 416 U.S. at 642).

6        As previously discussed, where a prosecutor is accused of withholding  exculpatory evidence,

7   a petitioner must show:   (1) the evidence was suppressed by the prosecution, either willfully or

8   inadvertently; (2) the withheld evidence was exculpatory or impeachment material; and (3) he was

9   prejudiced by the failure to disclose.   *See Strickler*, 527 U.S. at 281-82.   "Evidence is deemed

10  prejudicial, or material, only if it undermines confidence in the outcome of the trial."   *Benn*, 283 F.3d

11  at 1053 (citing *Bagley*, 473 U.S. at 676, Agurs, 427 U.S. at 111-12).   "Moreover, we analyze all of the

12  suppressed evidence together, using the same type of analysis that we employ to determine prejudice

13  in ineffective assistance of counsel cases."   *Id.* (citing *Bagley*, 473 U.S. at 682 and *United States v.*

14  *Shaffer*, 789 F.2d 682, 688-89 (9th Cir. 1986)).

15        a.  *Torres' Parole Detail Record*

16        Buchanan contends the prosecution provided an outdated parole detail record for Torres, which

17  was designed to conceal the fact that Detective McIvor knew the identity of Triste.  (Pet. at 12, ECF No.

18  40; Attach. C at 19, ECF No. 40-1.)   According to Buchanan, an up to date parole detail record would

19  have revealed that Torres' moniker was "Triste."  (Pet. at 12, ECF No. 40; Attach. C at 19, ECF No. 40-

20  1.)   This is essentially a rehash of claim four, subclaim two which this Court has already addressed in

21  section IV(B)(5)(b) of this R&R.   As discussed in that section, parole records are not in the possession

22  of the prosecution and may only be released to a party with a court order.   (*See* DOM § 71010.11.2.)

23  There is evidence, therefore, that either the prosecutor or McIvor was in possession of the CDCR file

24  or Torres' "Triste" moniker.   Further, Buchanan simply speculates the parole detail record would have

25  contained Torres' moniker "Triste," and speculation alone does not establish that the record contained

26  material information.   *See Strickler*, 527 U.S. at 281-82; *Benn*, 283 F.3d at 1052-53.   Moreover,

27  although evidence of McIvor's knowledge of Torres' "Triste" moniker would have impeached McIvor's

28  credibility to a degree, the evidence was not material because it does not undermine confidence in the

outcome of the trial.  *Benn*, 283 F.3d at 1053.  The essence of the prosecution's case was the credibility of Torres and, to a lesser degree, Chavez.  Given Torres' testimony about the kidnaping and gun possession, coupled with the testimony of the arresting officers regarding the gun and drugs found on Buchanan's person, impeaching McIvor about the reason for his stop of Buchanan's car would not have resulted in a more favorable outcome for Buchanan.  *Id.*

b. *Coaching and Threatening Witnesses*

Next, Buchanan claims the prosecutor and law enforcement used "leading, suggestive commentary, innuendo, untruths, badgering, coercion, etc., to coach, feed information to, and recruit interviewees to the prosecution's 'team.' "  (Attach. C at 19, ECF No. 40-1.)  As support for this assertion, Buchanan cites to exhibit nine, a copy of an FBI investigation report, exhibit ten, a copy of a transcript of an FBI interview of George Presson, and exhibit thirteen, a copy of a transcript of a phone interview of Jessica Chavez by Detective Gutierrez.  (*See* Lodgment 12, Attach. F, Exs. 9-10, 13.) Buchanan does not specify what portions of these exhibits demonstrate coercion, coaching or badgering on the part of prosecutors and law enforcement.

Buchanan's claim can be characterized as an allegation that the prosecution improperly relied on or presented coerced testimony at trial to secure Buchanan's conviction.  In such a claim, the question before a district court is "whether the post-arrest coercion of a government witness so tainted that witness' trial testimony as to render the testimony's admission a violation of the defendant's right to due process."  *Williams*, 384 F.3d at 594; *see also United States v. Mattison*, 437 F.2d 84, 85 (9th Cir. 1970).

Exhibit nine consists of a narrative report by FBI agent Ann Murphy, detailing an interview with Torres in which Torres relayed basically the same facts to which he testified at trial.  Torres told Murphy he was dating a woman he initially identified as Buchanan's niece, named "Susanna."  (Lodgment No. 12, Attach. F, Ex. 9 at 1.)  Buchanan, who Torres identified as a "Big Homie" or "validated member of the Mexican Mafia," called him after Torres had threatened Susanna and told Torres to stop.  (*Id.*) When Torres did not heed Buchanan's order, Buchanan went to Torres's brother's home with Parraz.  (*Id.* at 2.)  Buchanan told Torres he would have to "donate to the cause," and Torres told Buchanan he knew a drug dealer they could "tax."  (*Id.*)  While at the house, Parraz threatened Torres and displayed a gun.  Because he feared Buchanan and Parraz would resort to violence at his brother's home, Torres

agreed to accompany Buchanan and Parraz to the drug dealer's location, but feared Buchanan and Parraz were going to kill him. (*Id.*) While driving, law enforcement stopped the car. Parraz tossed his gun to Torres and told him to get out of the car and run, which Torres did. While running, Torres threw the gun at a wall and it discharged. (*Id.* at 3.) Upon arrest, Torres told law enforcement his life was in danger and the police "did not know who they had in custody." (*Id.*) Torres later told Murphy the woman he was involved with was actually a guard at Donovan State Prison whom he did not want to identify because he feared she would get in trouble and lose custody of her kids. Torres also stated he had initially been introduced to Buchanan by a fellow inmate named Ray Brooks. (*Id.*) Torres told law enforcement he was afraid to go to county jail or state prison because Mexican Mafia associates would be informed of his involvement in Buchanan's arrest and would be instructed to kill him. (*Id.*) Torres was offered federal custody, but declined. (*Id.*)

Exhibit ten is a transcript of a portion of an interview of George Dennis Presson by FBI Agents Ann Murphy and Matthew Desarno and Detective McIvor. It is not clear what the relevance of this interview is to Buchanan's case. In the interview, Presson is told of the necessity to tell the truth in order to avoid any future problems with law enforcement as a result of his filing a false report. (Lodgment No. 12, Attach. F, Ex. 10 at 3.) Agent Desarno then tells Presson that "[I]f you are honest with us and you sign up with us — I don't mean to officially sign up but if you are honest with us and you, you can come to our team . . . you really have to do that. Make a commitment to do that." (*Id.* at 4.) Agent Desarno then tells Presson that "[w]e're gonna take good care of you and you're gonna [sic] do the right thing. And we'll help you get yourself on the right track," but that "[i]f you try to play both sides, you're playing with fire on both sides." (*Id.*) Presson then tells the interviewers that he was a friend of Buchanan's, that Buchanan and three "soldiers" had show up his house one night and told Presson that he was going to take care of Buchanan for a while by allowing him to stay at Presson's house. (*Id.* at 6-7.) Presson told the interviewers at least one of the "soldiers" was armed with a gun. (*Id.*)

Exhibit thirteen is, as previously discussed, a transcript of a portion of an interview of Jessica Chavez by Detective Gutierrez. In it, Gutierrez questions Chavez about her association with and knowledge of Mexican Mafia members in prison and challenges her denial of knowledge. (*See*

1   Lodgment No. 12, Attach. F, Ex. 13.)

2   　　　None of the exhibits Buchanan has cited as support for this claim provide any evidence of

3   coercive measures or coaching.  Exhibit nine is simply a report of an interview with Torres in which

4   Torres essentially tells the same story he testified to at trial.  The report does not indicate Torres was

5   threatened with or promised any aid in return for false testimony.  Exhibit ten, Presson's interview, is

6   not relevant to this case in any manner the Court can discern, and, in any event, no coercive measures

7   are present in the interview.  Agents Murphy and Desarno and Detective McIvor simply informed

8   Presson that if he did not cooperate with law enforcement by telling the truth, he risked prosecution for

9   filing a false report.  Exhibit thirteen also does not indicate Chavez was coerced by Gutierrez into

10  providing false testimony.  The interview only recounts Gutierrez's confrontation of Chavez with regard

11  to the extent of her knowledge of Mexican Mafia members and associates in the face of her denial.

12  "Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas

13  relief." *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994); *see also Cox v. Del Papa*, 542 F.3d 669, 681 (9th

14  Cir. 2008).  Accordingly, Buchanan is not entitled to relief as to this claim.

15  　　　c.  *Withholding Evidence of Torres' Status as an FBI "Recruit"*

16  　　　Although not entirely clear, Buchanan seems to argue that Torres was an FBI recruit, and that

17  the prosecution failed to turn over his FBI interview.  (Attach. C at 20, ECF No. 40-1.)  Buchanan has

18  not provided any evidence that Torres was working for the FBI, or that there was an interview that the

19  prosecutor failed to turn over.  As previously stated, "[c]onclusory allegations which are not supported

20  by a statement of specific facts do not warrant habeas relief."  *James*, 24 F.3d at 26; *see also Cox*, 542

21  F.3d at 681.

22  　　　d.  *Withholding of Witness Interviews, Recordings, and Torres' Medical, Psychiatric and*

23  　　　　*Parole Records*

24  　　　Buchanan argues the prosecutor withheld evidence from the defense, including phone call

25  interviews with Chavez, recordings of interviews with witnesses, Torres' medical, psychiatric and parole

26  records, and other recorded material.  (Attach. C at 20-21, ECF No. 40-1.)  As previously discussed, to

27  prove a claim of withholding evidence, Buchanan must show:  (1) the evidence was suppressed by the

28  prosecution, either willfully or inadvertently; (2) the withheld evidence was exculpatory or impeachment

material; and (3) he was prejudiced by the failure to disclose. *See Strickler*, 527 U.S. at 281-82; *Benn*, 283 F.3d at 1052-53. "Evidence is deemed prejudicial, or material, only if it undermines confidence in the outcome of the trial." *Benn*, 283 F.3d at 1053. "Moreover, we analyze all of the suppressed evidence together, using the same type of analysis that we employ to determine prejudice in ineffective assistance of counsel cases." *Id.* (citing *Bagley*, 473 U.S. at 682 and *United States v. Shaffer*, 789 F.2d 682, 688-89 (9th Cir. 1986)).

This is essentially a rehashing of the claims Buchanan makes in claim four, which this Court has already addressed in section IV(B)(5)(a)-(d) of this R&R. For the reasons set forth in that section, Buchanan is not entitled to relief as to this claim. In addition, Buchanan fails to explain what material evidence was suppressed or how he was prejudiced by it. *Strickler*, 527 U.S. at 281-82.

e. *Failure to Present a Spanish Language Expert to Verify the Translations of the Wiretaps*

Buchanan argues the prosecutor committed misconduct when he failed to present a Spanish language interpreter at trial to verify the translation of the wiretaps. (Attach. C at 21, ECF No. 40-1.) He cites to Lodgment No. 12, Attachment F, Exhibit four as support for his claim. Exhibit four is a copy of a portion of a transcript of a hearing on pretrial motion to continue the trial by Rodney Brooks. In the transcript, the prosecutor noted that Brooks could "[cross-examine] the FBI about what wasn't done in this investigation" and could "[cross-examine] our language expert about the interpretation they had of the conversations that were captured on the wiretaps." (*Id.*) The prosecutor's statement may have meant the prosecutor was going to call a language expert at trial, or may have meant that Brooks could call the prosecution's language expert himself and cross-examine him or her. In any event, there is no federal constitutional requirement for the prosecutor to call any particular witness, only to prove every element of the charges beyond a reasonable doubt. *See In re Winship*, 397 U.S. 358, 361-62 (1970); *see also United States v. Bond*, 552 F.3d 1092, 1097 (9th Cir. 2009) (stating that "it is elementary that litigants are not *required* to call every witness identified on their witness list . . . [because] [w]hether a litigant actually calls all, or any, of the witnesses on its witness list is purely a matter of trial strategy") (emphasis in original). Buchanan is not entitled to relief as to this claim.

f. *Intimidation of Witnesses by Agent Desarno*

Buchanan alleges Agent Desarno intimidated defense witnesses by confronting those who spoke

53

to defense investigators by asking, "Why are you helping a killer?"  (Attach. C at 22, ECF No. 40-1.)
Buchanan does not provide any support for this claim, and the Court's review of the record also does
not reveal any support for the claim.  At a pretrial hearing, however, Buchanan's attorney alleged that
he had had "a great deal of difficulty and delay in interviewing witnesses in this case," and stated that
"when my investigator contacts a person, . . . if they call Agent Desarno or one of the other folks who
identifies them as a . . . cooperating witness, . . . he tells them not to talk."  (Lodgment No. 29, vol 5 at
304-05.)

Prosecutorial misconduct claims are subject to the harmless error analysis of *Brecht*, which
provides that Buchanan must establish that the misconduct had a "substantial and injurious effect or
influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 623; *see also Shaw v. Terhune*, 380
F.3d 473, 478 (9th Cir. 2004).  Buchanan has not established what evidence would have been presented,
or how that would have affected the outcome of his trial, in the absence of the alleged intimidation.
Moreover, Buchanan's claim is conclusory.  "Conclusory allegations which are not supported by a
statement of specific facts do not warrant habeas relief."  *James*, 24 F.3d at 26; *see also Cox*, 542 F.3d
at 681.  Accordingly, Buchanan is not entitled to relief as to this claim.

g.  *False Statements During Closing Argument*

Next, Buchanan contends the prosecutor made false statements during closing argument.  He
claims the prosecutor wrongly stated, "Is there ever a reference to caring about Ms. Chavez?  Is there
ever a reference to 'I personally like her.  We want to help her out?'  No."  (Attach. C at 22, ECF No.
40-1.)  Buchanan contends that, contrary to this statement, the prosecution had recorded phone calls
which revealed Brooks "was deeply in love with Ms. Chavez."  (*Id.*)  Buchanan does not state where
in the transcript the prosecutor made these statements, but it appears he is referring to the following
statements by the prosecutor during closing argument:

> [MR. BOST]: Nowhere in any of these calls is there the insinuation made by the
> defense that Mr. Brooks is telling Mr. Buchanan we need to help this person because
> they are being bothered by an inmate that got outside because we care about her.  We
> want to help her.
>
> They want to help themselves.

1     Nowhere in there does it say where Mr. Brooks reports, hey, there's a correctional officer
2  inside that I'd like to have an affair with, could you help me out and get this guy to leave her
  alone because I'm afraid she's going to get transferred and then I won't be able to sleep with her,
I won't be able to hang out with her.
3

4     That's not what's happening here.

5     What you saw from the very beginning of this case is the Mexican Mafia
  cultivating a relationship with a prison guard that can be beneficial to them.  That once
  this relationship develops further, they will have an edge over her.  They will have an
6  advantage over her.  She will be someone who can help them to take care of their
  business inside.

7

8 (Lodgment No. 35, vol. 11 at 1491.)

9     Buchanan does not provide any support for his contention that the prosecution was in possession

10 of recorded calls that contradicted the prosecution's argument, and the Court has not located any such

11 evidence in the record before it.  In any event, even if untrue, the prosecutor's statement did not so infect

12 the trial with unfairness that it denied Buchanan his federal due process rights.  *See Darden v.*

13 *Wainwright*, 477 U.S. 168, 181 (1986).  Prosecutors are given wide latitude in closing argument to argue

14 reasonable inferences from the evidence.  *Ceja v. Stewart*, 97 F.3d 1246, 1253-54 (9th Cir. 1996).  This

15 was a brief comment in a lengthy trial, and the evidence supporting Buchanan's convictions, specifically

16 the testimony by Torres and Chavez as well as the wiretapped phone calls, was overwhelming.

17 Accordingly, Buchanan is not entitled to relief as to this claim.  *See Greer v. Miller*, 483 U.S. 756, 765-

18 66 (1987) (stating that remarks alleged to constitute prosecutorial misconduct must be judged within the

19 context of the entire trial).

20    h. *Reference to Buchanan's Cell Phone as a Tool of Drug Dealers*

21     Buchanan also argues the prosecutor improperly used the fact that that he possessed a cell phone

22 to establish that Buchanan was a drug dealer.  (Attach. C at 22-23, ECF No. 40-1.)  Buchanan contends

23 this was misconduct because the cell phone was provided to him via a paid police informant.  (*Id.*)

24 Buchanan cites to the affidavit in support of the search warrant (Lodgment No. 12, Attach. F, Exhibit

25 23) and the testimony of Det. McIvor (Lodgment No. 33, vol. 9 at 1054) as support for this claim.

26     Even assuming the prosecutor improperly elicited this testimony as evidence that Buchanan was

27 a drug dealer, this single question, in the context of the trial as a whole, did not so infect the trial with

28 unfairness that it denied Buchanan his federal due process rights.  *See Darden*, 477 U.S. at 181.  As

1   noted above, the testimony of Torres and Chavez, in addition to the wiretapped phone calls, supported

2   Buchanan's convictions.  He is therefore not entitled to relief as to this claim.  *See Greer*, 483 U.S. at

3   765-66.

4   　　　i.  *Alleged Undisclosed Wiretap of Torres*

5   　　　Buchanan argues the prosecutor withheld evidence of a wiretap that was placed on Torres' phone

6   before the events of Buchanan's case. (Attach. C at 23, ECF No. 40-1.)  Buchanan tends this constituted

7   "suppression of evidence favorable to the defense."  (*Id.*)  Buchanan cites to Exhibit 15, which is a

8   portion of a motion filed by Buchanan's federal defense attorney in this Court.  (*See* Lodgment No. 12,

9   Attach. F, Ex. 15.)  In that motion, the attorney states in a footnote that "there was a state wiretap up on

10  Ernesto Torres, the passenger of interest and alleged victim of an alleged kidnaping plot, but the

11  application is not being turned over due to the government's characterization of it as 'not relevant' to

12  the issues in the federal wiretap."  (*Id*. at 3.)

13  　　　As previously discussed, to prove a claim of withholding evidence, Buchanan must show:  (1)

14  the evidence was suppressed by the prosecution, either willfully or inadvertently; (2) the withheld

15  evidence was exculpatory or impeachment material; and (3) he was prejudiced by the failure to disclose.

16  *See Strickler*, 527 U.S. at 281-82; *Benn*, 283 F.3d at 1052-53.  "Evidence is deemed prejudicial, or

17  material, only if it undermines confidence in the outcome of the trial."  *Benn*, 283 F.3d at 1053.

18  Assuming the wiretap evidence was suppressed, Buchanan has not established it was exculpatory or that

19  he was prejudiced by its suppression because he does not say what was contained in any wiretap of

20  Torres' phone and how it was exculpatory.  He has only presented "[c]onclusory allegations which are

21  not supported by a statement of specific facts [and] do not warrant habeas relief."  *James*, 24 F.3d at 26;

22  *see also Cox*, 542 F.3d at 681.  Accordingly, Buchanan is not entitled to relief as to this claim.

23  　　　j.  *Cumulative Error*

24  　　　Finally, Buchanan alleges that the cumulative effect of all the prosecutorial misconduct violated

25  his federal due process rights to a fair trial. (Attach. C at 23, ECF No. 40-1.)  "Cumulative error applies

26  where, although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal,

27  the cumulative effect of multiple errors has still prejudiced a defendant."  *Jackson v. Brown*, 513 F.3d

28  1057, 1085 (9th Cir. 2008) (quoting *Whelchel v. Washington*, 232 F.3d 1197, 1212 (9th Cir. 2000)).

1    Because the Court has determined there is no merit to the prosecutorial misconduct claims Buchanan

2    has alleged, it follows there was no cumulative error.  Accordingly, Buchanan is not entitled to relief

3    for his cumulative error claim.

4              9.      *Erroneous Admission of Testimony by the Gang Expert (Claim Eight)*

5              Buchanan next argues the testimony of the prosecution's gang experts was improperly admitted

6    because it went beyond the scope of the issues at trial and because the experts testified regarding

7    "ultimate facts" the jury was to decide.  (Pet. at 13, ECF No. 40; Attach. C at 24, ECF No. 40-1.)

8    Buchanan also argues trial counsel was ineffective for failing to object to this testimony.  (Pet. at 13,

9    ECF No. 40; Attach. C at 24, ECF No. 40-1.)  Because Buchanan raised this claim on direct appeal,

10   Respondent does not allege this claim is procedurally defaulted, but rather argues that the state court's

11   denial of this claim was consistent with state law and was neither contrary to, nor an unreasonable

12   application of, clearly established Supreme Court law.  (Mem. Supp. of Answer at 18-25, ECF No. 51-

13   1.)

14             Buchanan raised this claim in the petition for review he filed on direct appeal.  (Lodgment No.

15   8.)  That court rejected the claim in an order without citation of authority.  (Lodgment No. 10.)

16   Accordingly, this court must "look through" to the state appellate court opinion denying the claim to

17   determine whether the state court's denial was contrary to, or an unreasonable application of, clearly

18   established Supreme Court law.  *Ylst*, 501 U.S. at 805-06; *Williams*, 529 U.S. 412-13.  Citing California

19   law, that court wrote:

20             Buchanan argues the court should have limited the scope of the expert's
             testimony to basic gang-related information.  We disagree.  To say the workings of the
21           Mexican Mafia in and out of California prisons was central to this case is — at the very
             least — an understatement. Contrary to Buchanan's characterization, this was a complex
22           gang case, involving a major prison gang's activities and influence inside and outside

23           penal institutions. This is a subject clearly beyond a juror's common knowledge. Expert
             evidence of the workings and motivations of the Mexican Mafia, Buchanan's long-time
24           association with and stature within the gang and how the Mexican Mafia would find a
             prison guard a useful tool in its operations were essential to explain to lay jurors the
25           motive and intent for the principal crimes charged against Buchanan and Parraz —
             making a terrorist threat, assault with a semi-automatic firearm and kidnapping for
26           extortion.  (See *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1370 [gang expert's
             testimony explaining the defendant's need to discover identity of person who crossed out
27           gang "tag" and their violent reaction to person calling out name of rival gang held
             admissible on issues of motive and intent].)  Thus, the expert evidence was relevant
28           because it explained why a prison gang would become involved with a prison guard
             under these circumstances; why, under gang culture, Torres's reneging on his promise

to Buchanan, a Big Homie, was perceived as an extreme form of disrespect that justified his death; and why Parraz's status with the Mexican Mafia would benefit by assisting Big Homie in dispensing the punishment.  It is "difficult to imagine a clearer need for expert explication than that presented by a subculture in which this type of mindless retaliation promotes 'respect.'" (*Id.* at p. 1384.)   "The law does not disfavor the admission of expert testimony that makes comprehensible and logical that which is otherwise inexplicable and incredible." (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1551.)

Moreover, the testimony concerning the culture, habits, actions, membership, territorial claims and disputes involving the Mexican Mafia was unquestionably relevant to issues related to the gang enhancement.  The gang enhancement under section 186.22, subdivision (b)(1), "imposes additional punishment when a defendant commits a felony for the benefit of, at the direction of, or in association with a criminal street gang.  To establish that a group is a criminal street gang within the meaning of the statute, the People must prove: (1) the group is an ongoing association of three or more persons sharing a common name, identifying sign or symbol; (2) one of the group's primary activities is the commission of one or more statutorily enumerated criminal offenses; and (3) the group's members must engage in, or have engaged in, a pattern of criminal gang activity." (*People v. Duran*, *supra*, 97 Cal.App.4th at p. 1457.)

It is well established the prosecution may utilize expert testimony about gang culture and habits to establish the elements of a gang allegation. (*People v. Hernandez* (2004) 33 Cal.4th at pp. 1040, 1047-1048; *People v. Valdez* (1997) 58 Cal.App.4th 494, 506.)  Among other things, the experts' testimony was relevant and admissible on such gang-enhancement issues as establishing the Mexican Mafia was a criminal street gang within the meaning of section 186.22, subdivision (f); Buchanan was a Big Homie of the Mexican Mafia; and these three crimes were "committed for the benefit of, at the direction of, or in association with any criminal street gang." (§ 186.22, subd. (b)(1).)

As our high court has explained: "[T]he criminal street gang enhancement is attached to the charged offense and is, by definition, inextricably intertwined with that offense." (*People v. Hernandez*, *supra*, 33 Cal.4th at p. 1048.)  To the extent admission of evidence concerning the operation of the Mexican Mafia and the nature of its criminal activities was inflammatory, this aspect was a necessary byproduct of the evidence submitted to support a gang allegation.  It does not make the evidence inadmissible. (But see *People v. Avitia* (2005) 127 Cal.App.4th 185, 192-193 [evidence of gang posters in the defendant's room erroneously admitted, where there was no allegation the crime was gang-related and no gang enhancement was alleged].)

Buchanan specifically complains the following expert testimony was unnecessary:  details about irrelevant gang terms and gang activities, the Mexican Mafia's operations in and out of California prisons, the housing of Mexican Mafia members in segregation at the highest security prisons, the names of Big Homies active in San Diego County and the rarity of a woman involved in a supervisory capacity in the Mexican Mafia.  However to the extent any of this evidence was irrelevant, it was not unduly inflammatory or prejudicial in light of the other relevant gang evidence.

Buchanan also argues the expert opinions that the crimes were committed for the benefit of the Mexican Mafia were improper because the testimony went to an ultimate issue to be decided by the jury.

"There is no hard and fast rule that the expert cannot be asked a question that coincides with the ultimate issue in the case." (*People v. Wison* (1944) 25 Cal.2d 341, 349.)  Our Supreme Court continued: "'[T]he true rule is that admissibility depends on

the nature of the issue and the circumstances of the case, there being a large element of judicial discretion involved . . . . Oftentimes an opinion may be received on a simple ultimate issue, even when it is the sole one, as for example where the issue is the value of an article, or the sanity of a person; because it cannot be further simplified and cannot be fully tried without hearing opinions from those in better position to form them than the jury can be place in.'" (*Ibid*.)

"Expert testimony repeatedly has been offered to show the 'motivation for a particular crime, generally retaliation or intimidation' and 'whether and how a crime was committed to benefit or promote a gang.'" (*People v. Gonzalez*, *supra*, 126 Cal.App.4th at p. 1550; see also *People v. Valdez*, *supra*, 58 Cal.App.4th at pp. 507-508.)

The experts' opinion testimony here that Buchanan and Parraz committed the crimes against Torres for the benefit of the Mexican Mafia were rooted in the facts and evidence presented about the crime.  The expert's opinions were permissible.  (See *People v. Garcia* (2007) 153 Cal.App.4th 1499, 1512-1513.)

Buchanan's reliance on *People v. Killebrew*, *supra*, 103 Cal.App.4th 644 and *People v. Torres* (1995) 33 Cal.App.4th 37 is misplaced.  In *People v. Killebrew* police officers searched three cars close to the site of a gang shooting and discovered a gun in one car and a second gun near the other two cars.  (103 Cal.App.4th at p. 647.)  The defendant, a gang member found standing in the vicinity of the car containing the gun, was convicted of conspiracy to possess a firearm based on the expert's testimony that when one gang member in a car possesses a gun, every other gang member in the car knows of the gun and constructively possesses it.  (*Id*. at pp. 647-648, 652.)  The Court of Appeal found that this was improper expert opinion on an ultimate issue: a defendant's subjective intent and knowledge.  The evidence should have been excluded because it was the only evidence connecting the defendant to the firearm he was charged with conspiring to possess.  (*Id*. at p. 658.)  Further, "[s]ince the erroneously admitted testimony provided the only evidence to support the conspiracy theory, reversal of the judgment is required."  (*Id*. at p. 659.)  In *People v. Torres*, *supra*, 33 Cal.App.4th at pages 45 to 48, the expert defined the robbery and extortion and opined defendant committed robberies.  The court concluded that was impermissible expert testimony because the expert essentially opined defendant was guilty of robbery and first degree felony murder.

In contrast, neither Contreras's nor Gutierrez's testimony established an element of any crime, and they did not opine on whether Buchanan and Parraz committed the crimes against Torres.

"'[R]arely, if ever, does an expression of opinion by a so-called expert not amount to that which either the court or jury might adopt as a basis for the ultimate decision in the case.  However, that does not mean that the witness is deciding the case or that in so testifying he is usurping the functions of the jury.  He is merely giving an opinion based upon his technical training which the court may or may not accept as testimony that "was proper and necessary to an enlightened consideration and a correct disposition of the ultimate issue."'"  (*Eger v. May Department Stores* (1953) 120 Cal.App.2d 554, 559.)

Next, Buchanan complains Contreras was improperly allowed to testify Buchanan ran a gang crew and was involved in distributing drugs, extortions, taxing and ordering assaults with a deadly weapon.  Buchanan asserts this testimony was based on incompetent hearsay.  Experts, however, "may give opinion testimony that is based upon hearsay, including conversations with gang members as well as with the defendant.  [Citations.] Such opinions may also be based upon the expert's personal investigation

of past crimes by gang members and information about gangs learned from the expert's colleagues or from other law enforcement agencies." (*People v. Vy* (2004) 122 Cal.App.4th 1209, 1223, fn. 9; see also *People v. Duran*, *supra*, 97 Cal.App.4th at p. 1465.) Further, the determination of whether to exclude extrajudicial matters relied on by such experts in forming their opinions because they "conflict with an accused's interest in avoiding substantive use of unreliable hearsay . . . must generally be left to the trial court's sound judgment." (*People v. Valdez*, *supra*, 58 Cal.App.4th at p. 510.)

Moreover in this case the hearsay testimony about Buchanan's criminal activities was elicited on re-direct examination after Buchanan's defense counsel opened the door about Contreras's knowledge on the subject during cross-examination. There was no error in admitting this testimony.

Inasmuch as we have rejected Buchanan's appellate arguments concerning the admission of the gang experts' testimony, we need not further address his alternative theory for relief — namely, that he received ineffective assistance of counsel because his trial counsel did not object to the disputed expert gang evidence when it was introduced. To establish ineffective assistance of counsel, a defendant must show we was prejudiced by counsel's deficient representation. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688.) Buchanan cannot show he was prejudiced by the admission of the expert gang evidence or by his counsel's failure to object to it during trial.

(Lodgment No. 7 at 11-20.)

To the extent Buchanan is challenging the application of state evidentiary law, he is not entitled to relief. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (holding that federal habeas relief is not available for alleged violations of state law); see also 28 U.S.C. § 2254(a). Buchanan can establish a violation of his federal constitutional rights, however, if he can show the admission of the evidence was so prejudicial that it "'fatally infected the trial.'" *Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 897 (9th Cir. 1996) (quoting *Kealohapauole v. Shimoda*, 800 F.2d 1463, 1465 (9th Cir. 1986)).

Buchanan was charged with making a criminal threat, assault with a semi-automatic firearm and kidnaping for ransom, all for the benefit of a street gang within the meaning of Penal Code § 186.22(b)(1). That section reads as follows:

Except as provided in paragraphs (4) and (5), any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to all the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished . . . .

Cal. Penal Code § 186.22(b)(1).

Buchanan was alleged to have committed the crimes for the benefit of the Mexican Mafia. (Lodgment No. 21, vol. 1 at 0010.) As the state court noted, in order to prove the Mexican Mafia is a

1   "criminal street gang" within the meaning of Penal Code § 186.22(b)(1), the prosecution had to prove

2   that "(1) the [Mexican Mafia] is an ongoing association of three or more persons sharing a common

3   name, identifying sign or symbol; (2) one of the group's primary activities is the commission of one or

4   more statutorily enumerated criminal offenses; and (3) the [Mexican Mafia's] members must engage

5   in or have engaged in, a pattern of criminal gang activity." *People v. Duran*, 97 Cal. App. 4th 1448,

6   1457 (2002). The prosecution presented two expert witnesses, Detective Steve Contreras and Detective

7   Mike Gutierrez. Each testified to different portions of the gang allegation the prosecution sought to

8   prove against Buchanan.

9        At the time he testified, Contreras had worked for the CDCR for eighteen years. (Lodgment No.

10   30, vol. 6 at 365-66.) Contreras' testimony was relevant to prove "the [Mexican Mafia] is an ongoing

11   association of three or more persons sharing a common name, identifying sign or symbol." *Duran*, 97

12   Cal. App. 4th at 1457. Contreras first testified about his qualifications as an expert, working for the

13   CDCR and as a parole agent. (Lodgment No. 30, vol. 6 at 365-81.) Contreras also explained how the

14   security and inmate classification within the prison system works in order to explain how California

15   prisons deal with gangs. (*Id.*) The Mexican Mafia is a gang that operates inside California prisons and

16   gang members from the streets make up the "backbone" of the Mexican Mafia. (*Id.* at 390-91, 396.)

17   Another name for the Mexican Mafia is "Eme," the Spanish letter M. (*Id.* at 391-92.) When an inmate

18   is in prison, he or she must obey the dictates of the gang with which they are associated or risk assault

19   or death. (*Id.* at 396.) In 2005, there were 1145 validated members and associates of the Mexican Mafia

20   in the CDCR system. (*Id.* at 392.) Contreras also talked about the process by which prisoners are

21   validated as Mexican Mafia members. (*Id.* at 403-04.)

22        At the time he testified, Detective Mike Gutierrez had worked as a detective specializing in

23   gangs for nineteen and a half years. (Lodgment No. 33, vol. 9 at 1178-82.) His testimony also

24   supported the prosecution's evidence that the Mexican Mafia is a gang for purposes of Penal Code §

25   186.22(b)(1). Gutierrez testified about the names and "turfs" of various gangs in the southern portion

26   of San Diego county. (*Id.* at 1183-84.) These gangs operate under the "umbrella" of the Mexican

27   Mafia. (*Id.* at 1187.) He testified that various gangs use various symbols, tattoos and graffiti to identify

28   themselves. (*Id.* at 1183-84.) Specifically, Gutierrez testified that Mexican Mafia members sometimes

1   have a black hand and/or the letter "M" tattooed on their body.  (*Id.* at 1194.)

2       Contreras' testimony was also relevant to prove "the primary activities [of the Mexican Mafia]

3   is the commission of one or more statutorily enumerated offenses."  *Duran*, 97 Cal. App. 4th at 1457.

4   "The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more

5   of the statutorily enumerated crimes must be one of the group's 'chief' or 'principal' occupations."  *Id.*

6   at 1464 (quoting *People v. Senqpadychith*, 26 Cal. 4th 316, 322 (2001)) (internal quotations omitted).

7   Homicide, the sale, transportation, and possession for sale of drugs, intimidation of witnesses,

8   kidnaping, torture, and extortion are listed in § 186.22(e) as the enumerated offenses which can form

9   these "primary activities."  *See* Penal Code § 186.22(e)(3), (4), (8), (15), (18), (19).  Contreras testified

10  that inside prisons, the Mexican Mafia's main business relates to "power, status, intimidation and

11  control."  (Lodgment No. 30, vol. 6 at 405.)  It is involved in drug trafficking, assaults, and homicides

12  in prison; outside the prison, it controls the gang via intimidation and engages in extortion, kidnaping,

13  torture, homicides, and the sale and transport of drugs.  (*Id.* at 406.)  Both inside the prison and on the

14  streets, the Mexican Mafia engages in "taxing" of drug dealers whereby gang members force drug

15  dealers in the gang's territory to pay a portion of their profits to the gang.  (*Id.* at 406-07.)  Gutierrez also

16  testified that the main activity the Mexican Mafia engages in outside of prison is "taxing."  (Lodgment

17  No. 33, vol. 9 at 1193.)

18      Finally, Gutierrez's testimony was relevant to prove that the Mexican Mafia engages in a pattern

19  of criminal activity.  *Duran*, 97 Cal. App. 4th at 1457.  "A 'pattern of criminal activity' is defined as a

20  gang members' individual or collective 'commission of, attempted commission of, conspiracy to

21  commit, or solicitation of, sustained juvenile petition for, or conviction of two or more' enumerated

22  'predicate offenses' during a statutorily defined time period."  *Id.* (quoting Penal Code § 186.22(e), and

23  citing *People v. Gardeley*, 14 Cal. 4th 605, 617 (1996)).  The enumerated offenses include assault with

24  a deadly weapon, robbery, and kidnaping.  Cal. Penal Code § 186.22(e)(1), (2), (15).  Referring to

25  certified copies of conviction records, Gutierrez testified that known members of the Mexican Mafia,

26  Alfredo Fonseca, Jose Yanez and Monica Yanez had committed the crimes of kidnaping, robbery,

27  assault with a firearm and attempted murder.  (Lodgment No. 33, vol. 9 at 1195-98.)  In his opinion, the

28  crimes were committed for the benefit of the Mexican Mafia.  (*Id.* at 1196, 1198.)

Both Contreras' and Gutierrez's testimony was also relevant to prove the substantive crimes of which Buchanan was charged. Both experts discussed the structure of the Mexican Mafia, who is in charge, who can give orders, who must obey those orders and what the consequences of disobeying those order were. (Lodgment No. 30, vol. 6 at 396; vol. 9 at 1189-1201.) This evidence was relevant and probative to show why Buchanan and Parraz would go to such extreme measures to enforce Buchanan's edict that Torres stay away from Chavez and why Parraz would help Buchanan.

As the state court properly concluded, both Contreras' and Gutierrez's testimony was relevant and probative of both the gang allegations and the substantive crimes charged against Buchanan. To the extent that Contreras and Gutierrez were permitted to testify about the specifics of gang culture, the inner operations of the California prison system, the structure of the Mexican Mafia and gang terminology, it was necessary background information which the prosecutor properly introduced in order to prove the motivations and intent of Buchanan and Parraz and to assist the jury in understanding the testimony of Contreras, Gutierrez, Chavez and Torres. The admission of such relevant testimony was, therefore, not so prejudicial that it "'fatally infected the trial.'" *Ortiz-Sandoval*, 81 F.3d at 897. To the extent that Buchanan claims the experts' testimony was repetitive, and therefore prejudicial, his claim is also without merit. Contreras' testimony focused mainly on whether the Mexican Mafia met the definition of a criminal street gang pursuant to Penal Code § 186.22(b)(1) and whether the gangs' primary activities were those crimes enumerated in the gang statute. Gutierrez's testimony focused mainly on the question whether members of the Mexican Mafia had engaged in a pattern of criminal activity by being convicted of two or more of the enumerated offenses in Penal Code § 186.22(e). To the extent the testimony of the two experts overlapped, it was minor and not so prejudicial as to have "fatally infected" Buchanan's trial. *Id.*

Regarding Buchanan's claim that the experts were permitted to testify about "ultimate facts" that the jury was to determine, he is not entitled to relief. Contreras and Gutierrez simply offered their opinions, based on their expertise, as to whether the crimes were committed for the benefit of the Mexican Mafia. The jury was free to reject those opinions and come to a different conclusion. In any event, the Court is unaware of any clearly established Supreme Court law that prevents an expert from rendering an opinion on an ultimate fact that must be decided by the jury. In the absence of such

1    authority, Buchanan is not entitled to federal habeas corpus relief. *See Carey v. Musladin*, 549 U.S. 70,

2    76-77 (2006).

3           Finally, Buchanan's ineffective assistance of counsel claim also fails. The expert testimony

4    evidence was properly admitted; consequently, there was no basis upon which counsel could have

5    objected to the testimony, and Buchanan has not established he was prejudiced by counsel's failure to

6    do so. *See Strickland*, 466 U.S. at 687-89. Accordingly, habeas relief is not available to Buchanan as

7    to this claim because the state court's denial was neither contrary to nor an unreasonable application of,

8    clearly established Supreme Court law. *Williams*, 529 U.S. at 412-13.

9           10.    *Ineffective Assistance of Trial Counsel (Claim Nine)*

10          Buchanan alleges trial counsel was ineffective for the following reasons: (1) failure to challenge

11   admission of the wiretapped phone conversations; (2) failure to object to Chavez's testimony regarding

12   the meaning of terms used in the wiretapped phone conversations; (3) failure object to Chavez's

13   testimony regarding her rape by Torres; (4) failure to obtain the dispatch tapes for the stop of

14   Buchanan's car, which led to the denial of the motion to suppress; (5) failure to adequately investigate

15   the accuracy of the translation of the wiretaps; (6) failure to obtain Torres' medical, psychiatric and

16   prison records; (7) failure to make an adequate record regarding the jury's view of Buchanan's

17   shackling; (8) failure to obtain Buchanan's gang validation packet; (9) failure to obtain and Spanish

18   language expert; (10) failure to call a methamphetamine expert, Matthew Carol, to testify about Torres'

19   drug use and how it affected his perception of events; (11) failure to ask Buchanan to testify; (12) failure

20   to use wiretap number 1223 at trial; (13) failure to introduce transcripts of Torres' voice mail messages

21   to Chavez; (14)  failure to call an expert on stalking; and (15) failure to properly prepare for the motion

22   to suppress.  (Pet. at 14, ECF No. 40; Attach. C at 30-35, ECF No. 40-1; Traverse at 24-26, ECF No.

23   77.) Respondent contends that Buchanan raised grounds one, two and three of his ineffective assistance

24   of counsel claim in his petition for review on direct appeal in state court, but did not raise those grounds

25   in the First Amended Petition he filed in this Court.  Further, Respondent argues the additional

26   ineffective assistance of counsel grounds, grounds four through fourteen, were raised only in the habeas

27   corpus petitions he filed in state court and are thus procedurally defaulted pursuant to *Dixon* for the same

28   reasons claims one through seven and eleven are procedurally defaulted.  (Answer at 16-18, ECF No.

51; Mem. of P. & A. Supp. Answer at 13 and fn. 2, ECF No. 51-1.)

It is not entirely clear from Buchanan's First Amended Petition whether he is raising grounds one through three in this Court.  While he cites to only the factual portion of his appellate brief, he also states that "additional facts, pursued on habeas by Petitioner, in prose, relating to claim of ineffective assistance of counsel are as follows."  (Pet. at 14, ECF No. 40.)  In the interest of thoroughness, however, the Court will address those grounds.

As noted by Respondent, grounds one, two and three were raised by Buchanan in the petition for review he filed in the California Supreme Court, which rejected the claims without citation of authority. (Lodgment No. 10.)  Accordingly, the Court must "look through" to the state appellate court opinion denying those claims as the basis for its analysis to determine whether the state court's denial of the claim was contrary to, or an unreasonable application of, clearly established Supreme Court law. *Ylst*, 501 U.S. at 805-06; *Williams*, 529 U.S. at 412-13.  The question whether grounds four through fourteen are procedurally defaulted is addressed in section IV(B)(2) of this R&R.  As with the other claims Respondent argues are procedurally defaulted, the Court will address the merits of the claim and apply a de novo standard of review.

To prevail on a claims of ineffective assistance of trial counsel in federal court, Buchanan must have first established in state court that his trial counsel's performance fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  "This requires a showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.*  Judicial scrutiny of counsel's performance must be "highly deferential." *Id.* at 689.  Second, he must have shown counsel's deficient performance prejudiced the defense, such that the result of the proceeding would have been different absent counsel's errors. *Id.* at 687.  On federal habeas review, "the question is not whether counsel's actions were reasonable, [but] whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." *Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770, 788 (2011).  The Court need not address the performance prong if the claim can be resolved on the ground of lack of sufficient prejudice. *Strickland*, 466 U.S. at 697.

/ / /

a. *Failure to Challenge the Admission of the Wiretapped Phone Conversations*

Buchanan contends counsel should have challenged the admission of the wiretapped phone conversations as both irrelevant and more prejudicial than probative under California Evidence code section 352. (Pet. at 14, ECF No. 40; Lodgment No. 1 a 66-72.) The appellate court addressed this claim as follows:

> As a general rule, evidence of gang membership and activity is admissible if it is logically relevant to some material issue in the case, other than character evidence, is not more prejudicial than probative, and is not cumulative. (*People v. Avitia*, *supra*, 127 Cal.App.4th at 192.) Consequently gang evidence may be relevant to establish the defendant's motive, intent or some fact concerning the charged offenses other than criminal propensity as long as the probative value of the evidence outweighs its prejudicial effect. (*People v. Williams* (1997) 16 Cal.4th 153, 193; see generally Evid. Code, § 352.) "Evidence of the defendant's gang affiliation — including evidence of the gang's territory, membership, signs symbols, beliefs and practices, criminal enterprises, rivalries, and the like — can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*People v. Hernandez*, *supra*, 33 Cal.4th at p. 1049; see e.g., *People v. Jones* (2003) 30 Cal.4th 1084, 1114-1116 [evidence of gang membership and formation of gang was admissible because it was relevant to show relationship between individuals involved in the robberies and the advance plan to kill victims and witnesses].)

> The tapes revealed (1) how Brooks and Buchanan came to believe Torres had to be sanctioned or killed because he disrespected Buchanan by not keeping his word to leave Chavez alone and (2) why she was thought to be an asset of the Mexican Mafia. The intercepted calls were clearly relevant to show the motives of Buchanan and Parraz and their intent in making a terrorist threat, assaulting Torres with a semi-automatic firearm and kidnapping him. (Evid. Code § 210.) Accordingly, we reject Buchanan's argument the calls constituted impermissible propensity evidence under Evidence Code section 1101, subdivision (a), and find they were admissible under Evidence Code section 1101, subdivision (b), to show motive and intent.

> Further, the intercepted calls constituted independent evidence of an uncharged conspiracy under the hearsay exception of Evidence Code section 1223 (the exception for statements made during the existence and in furtherance of a conspiracy) and showed an ongoing conspiracy existed before the kidnapping. (See *People v. Herrera* (2000) 83 Cal.App.4th 46, 60-61.) The taped phone conversations were clearly relevant. Counsel's failure to make meritless objections cannot be deemed deficient performance. (See *People v. Coddington* (2000) 23 Cal.4th 529, 625, overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn.13.)

> Buchanan also claims trial counsel rendered deficient performance by not objecting to the tapes or seeking redaction under Evidence Code section 352. Because gang evidence can be inflammatory, the trial court must determine not only the evidence is relevant, but also it is not unduly prejudicial. However, it is important to realize the purpose of Evidence Code section 352 is to prevent *undue* prejudice, that is "'"evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues,"' no the prejudice that naturally flows from relevant, highly probative evidence.' " (*People v. Padilla* (1995) 11 Cal.4th 800, 823, fn. 1.) "'"[A]ll evidence which tends to prove guilty is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is 'prejudicial.'" . . . In applying Section 352, 'prejudicial' is not synonymous with "damaging.'" [Citation.]'" (*People v.*

*Poplar* (1999) 70 Cal.App.4th 1129, 1138.)  An objection under Evidence Code section 352 will not be sustained unless there is undue prejudice that substantially outweighs the relevance of the evidence.  (*People v. Ewoldt*, *supra*, 7 Cal.4th at p. 404.)

Given the facts in this case it was inescapable extensive evidence concerning the Mexican Mafia and its criminal activities would be presented at trial.  In light of this, the evidence of the taped conversations was not so out of the ordinary or so particularly prejudicial that it would be an abuse of discretion to admit the tapes.  The probative value of the taped calls outweighed their prejudicial effect.  Also, most of the tapes were brief, with the longest tape running 31 minutes; they did not take up an excessive amount of time.  Further, there was relatively little overlap or cumulative testimony, and it is clear an Evidence Code section 352 objection to any of this evidence would have been overruled, and properly so.  (*People v. Williams*, *supra*, 16 Cal.4th at p. 673.)  Counsel cannot be ineffective for failing to make a futile objection.  (*People v. Coddington*, *supra*, 23 Cal.4th at p. 625.)

(Lodgment No.7 at 24-27.)

The state court's analysis of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *Williams*, 529 U.S. at 412-13.  The state appellate court thoroughly and accurately discussed the admissibility of the wiretapped phone evidence.  As the state court noted, the tapes were clearly relevant to establish motive and intent with regard to the kidnaping and assault with a semiautomatic firearm charge, as well as to the gang allegation charges.  This Court agrees that any objection to the admission of the tapes would have been futile, and thus Buchanan has not established deficient performance on the part of his attorney.  *Strickland*, 466 U.S. at 689.  Moreover, Buchanan has not established he was prejudiced by the admission of the tapes in unredacted form.  Given the expert testimony presented about the Mexican Mafia and Buchanan's role in it, he has not established that the result of the proceeding would have been different if the tapes had been redacted.  *Id.* at 687.  Because the state court's denial was not objectively unreasonable, he is not entitled to relief as to this claim.

   b. *Failure to Object to Jessica Chavez's Testimony About the Meaning of Terms Used*
      *in the Wiretapped Phone Calls*

Next, Buchanan claims counsel should have objected when Chavez testified regarding the meaning of certain terms used by Buchanan and Brooks because Chavez's interpretation of the terms was irrelevant and that she did not have sufficient knowledge or expertise to testify on the matters.  (*See* Lodgment No. 1 at 72-74.)  Specifically, Buchanan says Chavez should not have been permitted to testify that the term "black" meant black tar heroin, and that a reference to someone having a "green

light" on them meant that person could be assaulted.  (*Id.*)  Further, Buchanan objects to Chavez being permitted to speculate as to whether some prison guards at Donovan were assisting the Mexican Mafia and denying she was one of them.  (*Id.*)

As with the preceding claim, the last reasoned state court decision to address this claim is the state appellate court opinion in Buchanan's direct appeal.  *See Ylst*, 501 U.S. at 801-06.  That court stated:

> Buchanan contends counsel rendered ineffective assistance by not objecting to Chavez's testimony regarding the two calls because her lay opinion about the content of calls was irrelevant and she had no personal knowledge whether there were prison guards working for the Mexican Mafia at Donovan.  Buchanan also claims counsel should have objected under Evidence Code section 352 to Chavez's testimony about prison guards working for the Mexican Mafia at Donovan because it was prejudicial.  These contentions are without merit.
>
> Chavez's testimony regarding the gang terms was relevant because it showed the extent of her knowledge and her perceptions of how the Mexican Mafia worked.  This was the prison guard who was at the center of the violent crimes involved in this case — perhaps unwittingly — but who nonetheless sets in motion the crimes by complaining to Brooks about Torres.  The testimony was probative of Chavez's role in these crimes; counsel cannot be faulted for not lodging an objection.  Also, there was nothing improper about Chavez's testimony denying assertions she assisted the Mexican Mafia.
>
> As to Chavez's testimony about other prison guards assisting the Mexican Mafia, she made it clear she had no personal knowledge whether this was true or not; hence, any error was harmless.  Chavez said her only source of information concerning guards assisting the Mexican Mafia was Brooks.  The jury heard Brooks discuss this subject with Buchanan on the taped calls.  Since there was no undue prejudice from Chavez's testimony, counsel was not deficient for not objecting to this aspect of Chavez's
>
> testimony under Evidence Code section 352.  (*Strickland v. Washington*, *supra*, 466 U.S. at p. 697.)

(Lodgment No. 7 at 28-29.)

This Court cannot find fault with the state court's analysis.  Buchanan has not established he suffered any prejudice from Chavez's testimony.  *Strickland*, 466 U.S. at 687.  With regard to Chavez's testimony about the meaning of "green light," both the prosecution's gang expert, Steve Contreras, and the defense's gang expert, Dennis Bammann, testified consistently with Chavez that "green light" meant the Mexican Mafia had authorized an assault on an individual.  (*See* Lodgment No. 30, vol. 6 at 421; Lodgment No. 34, vol. 10 at 1255.)  Chavez's testimony that "black" meant heroin was not sufficiently prejudicial by itself to warrant habeas relief.  *Strickland*, 466 U.S. at 687; *Harrington*, 131 S. Ct. at 788.

1   It was an extremely brief portion of Chavez's testimony, one question out of nearly two hundred pages

2   of testimony and not central to the issues the jury had to resolve.

3         With regard to Chavez's testimony about prison guards working for the Mexican Mafia, she

4   spoke only from her personal opinion and knowledge.  When asked if she took Brooks' comment,

5   "We've got two or three or three or four working for us" to mean that people inside Donovan were

6   working for the Mexican Mafia, Chavez said that she did.  When asked if she was aware of guards

7   working for the Mexican Mafia, Chavez said she was told by Brooks there was one individual who was

8   doing so.  She did not testify that she knew of any such guards herself, nor did she speculate about the

9   existence of such guards.  (*See* Lodgment No. 30, vol. 6 at 520-21.)  As the state court pointed out, the

10  jury heard Brooks' comments regarding the possibility that people on the inside of Donovan were

11  working for the Mexican Mafia:

12        BROOKS: And I'm telling him, "Hey, homie, respectfully dog, you're on the
    streets, don't fuck up what we're trying to accomplish in here."  Tio, we have almost
13  three.  We have almost three, four working with us, right?

14        BUCHANAN: Yeah.

15        BROOKS: And the last thing we need is the people that . . . those people inside
    to . . . to know that . . . "Oh, this girl, she was fired because this," and then they are going
16  to scare everyone else.

17  (Lodgment No. 1 at 0070.)

18        A reasonable jury would have concluded from this wiretapped phone call alone that Brooks and

19  Buchanan had secured the cooperation of three or four people working inside of Donovan State Prison.

20  Thus, Buchanan has not established that he suffered any prejudice from Chavez's testimony, and he is

21  therefore not entitled to relief as to this claim.

22        c. *Failure to Object to Chavez's Testimony About Her Rape by Torres*

23        Buchanan also complains that counsel should have objected to Chavez's testimony about being

24  raped by Torres.  (Lodgment No. 1 at 74-75.)  He contends the testimony was irrelevant to the charges

25  and prejudiced his defense by encouraging speculation by the jury about gang members' involvement

26  in rapes and by heightening the jury's fear of Buchanan and Brooks.  (*Id.*)

27        As with the preceding two claims, the state appellate court's opinion addressing the claim is the

28  last reasoned state court decision to which this Court must look as the basis for its analysis.  *Ylst*, 501

U.S. at 801-06.  That court wrote:

> The evidence was probative of Chavez's credibility because of the tardiness of her report.  This was another example of Chavez not being forthright with law enforcement authorities about the events of this case.  It was a proper factor for jury consideration in evaluating her credibility.  Evidence of the rape — if believed by the jury — also shed light on Torres's character.
>
> Buchanan unpersuasively argues that the evidence of the sodomy by Torres "permitted the jury to engage in speculation and conjecture about gang members and the commission of rapes" and "could only serve to heighten the jury's fear of [Buchanan] and Brooks."  Not only is Buchanan's argument based on speculation and conjecture, it fails to recognize Torres's rape of Chavez had nothing to do with Buchanan, and there was no evidence other Mexican Mafia members engaged in sex crimes.  The rape evidence reflected poorly on Torres and Chavez (for nor reporting it sooner); it was not prejudicial against Buchanan or Parraz.  Counsel was not ineffective for failing to object to the rape evidence.

(Lodgment No. 7 at 30-31.)

The state court's analysis of this claim is consistent with *Harrington*.  Trial counsel could have very reasonably concluded that the damaging effect of the evidence of rape on both Chavez's credibility and on Torres' character far outweighed any prejudice that might have occurred as a result of its admission.  *Harrington*, 131 S. Ct. at 788 (stating that "the question is not whether counsel's actions were reasonable, [but] whether there is any reasonable argument that counsel satisfied Strickland's deferential standard").  Buchanan is not entitled to relief as to this claim.

> d.  *Failure to Acquire the Dispatch Tapes for the Stop of Buchanan's Car*

Buchanan contends that counsel rendered ineffective assistance when he failed to secure the dispatch tapes (TAC 3) for the stop of his car.  (Pet. at 14, ECF No. 40; Attach. C at 30, ECF No. 40-1.)  He argues that his motion to suppress evidence would have been successful had the tapes been used.  (Pet. at 14, ECF No. 40; Attach. C at 30, ECF No. 40-1.)  Because it is unclear whether this claim is procedurally defaulted, the Court will analyze this claim de novo.  *Pirtle*, 313 F.3d at 1167.

As previously discussed in section IV(B)(3)(b) of this R&R, McIvor testified at the hearing on the motion to suppress that he told Officer Nunez to stop Buchanan's car because he feared for the safety of one of the individuals who was in the car, someone he identified as "Triste."  (Lodgment No. 27, vol. 3 at 75-80.)  The information about the threat came from the wiretap on Buchanan's and others' phones.  (*Id.* at 77.)  McIvor testified at the motion hearing that he directed Nunez to stop the car because of the threat to Triste's life.  He also told Nunez that he believed Triste was a parolee at large

1    and that Nunez could use that as the reason for the stop.  (*Id.* at 80.)  Buchanan claims that had counsel

2    obtained the TAC 3 transcript, he could have used it to impeach McIvor because the TAC 3 transcript

3    indicates McIvor told Nunez to use the fact that Buchanan's front license plate was barely attached as

4    a pretext to stop the car.  (Pet. at 14, ECF No. 40; Attach. C at 30, ECF No. 40-1.)   As previously

5    discussed, however, McIvor testified at the motion hearing that he communicated with Nunez via cell

6    phone, and thus the information imparted to Nunez about the threat to Triste and his status as a parolee

7    at large was not contained in TAC 3 transcript.  Thus, there is nothing in the TAC 3 transcript that

8    contradicts McIvor's testimony at the motion hearing or that nullifies the probable cause officers had

9    to stop Buchanan's car, namely, their belief, based on the wiretaps, that Buchanan and Parraz were

10   going to kill Triste.  That officers were attempting to use other, valid bases for the stop, such as

11   McIvor's belief that Triste was a parolee at large or that Buchanan's licence plate was hanging down,

12   in order to keep the existence of the wiretap secret, does not alter the fact that the perceived threat to

13   Triste provided sufficient probable cause to stop Buchanan's car.  *See Wren*, 517 U.S. at 811-12.

14            e. *Failure to Adequately Investigate the Accuracy of the Translations of the Wiretaps*

15            Buchanan next contends counsel rendered ineffective assistance when he failed to sufficiently

16   investigate the accuracy of the translations of the wiretapped phone calls.  (Attach. C at 30, ECF No.

17   40-1.)  Because it is unclear whether this claim is procedurally defaulted, the Court will analyze this

18   claim de novo.  *Pirtle*, 313 F.3d at 1167.

19            Buchanan makes the same allegations about the inaccuracy of the translations as he does in

20   ground three, wherein he argues that two of Brooks' statements were inaccurately translated.  The first

21   statement, "[T]here is one other thing . . . I have a person here that, that, that watches over the businesses

22   I have here," Buchanan argues, should have been translated as "I have a person here that takes care of

23   me with what I got, her issues."  In the second statement, "So, I wanted . . . so, so I wanted to talk to him

24   first and if, if he doesn't behave then it's like all right, he's fucked and then I'll let you get at him, uh,

25   later you know what I mean," Buchanan contends the phrase "he's fucked" should have been translated

26   as "I know I crapped," meaning "I failed to win."  (Pet. at 8, ECF No. 40; Attach. C at 30, ECF No. 40-

27   1;  Lodgment No. 12, Attach. F, Ex. 17 at 7-8.)

28            As this Court has already concluded in the context of Buchanan's claim the prosecutor used false

evidence to convict him, *see* section IV(B)(3)(d) and (8) (e) of this R&R, Buchanan has not established he suffered any prejudice from the allegedly inaccurate translations.  The first challenged statement was immediately followed by an unchallenged exchange between Brooks and Buchanan in which Brooks refers again to "the person who helps me out with, with my business inside, my connection." (Lodgment No. 21, vol. 1 at 0021.)  The second allegedly incorrect translation also did not prejudice Buchanan. Even if the jury had heard the translation Buchanan alleged was correct, "if he doesn't behave then it's like all right, I failed to win, and then I'll let you get at him," instead of the allegedly incorrect translation, "if he doesn't behave then it's like all right, he's fucked, and then I'll let you get at him," the jury could easily have concluded that Brooks wanted an opportunity to persuade Torres to do as he was told, but that, if he did not, Brooks would conclude he had failed and, at that point, Buchanan would go after Torres with more serious measures.  Thus, Buchanan has not established sufficient prejudice under *Strickland* because he has not shown the result of the proceeding would have been different absent counsel's alleged errors.  *See Strickland*, 466 U.S. at 687.

> f. *Failure to Adequately Investigate Torres' Prison Records, Mental Health Records,*
> *and Parole Records*

Next, Buchanan argues counsel failed to adequately investigate Torres' background, specifically his prison disciplinary records, his mental health records, and his parole records.  (Attach. C at 30-31, ECF No. 40-1.)  Because it is unclear whether this claim is procedurally defaulted, the Court will analyze this claim de novo.  *Pirtle*, 313 F.3d at 1167.

As with the preceding claim, this Court has already addressed the lack of prejudice Buchanan suffered from the lack of such records in section IV(B)(5)(a) and (8)(a) and (d) of this R&R.  As this Court noted in that portion of the R&R, Torres was thoroughly impeached with various lies, crimes and misdeeds.  Buchanan has not specified what additional evidence Torres' prison records, mental health records, parole records and voice mail messages contained.  He simply speculates that additional impeachment evidence would have been discovered and presented had counsel done so.  Without specific evidence and the effect such evidence would have had on the outcome of his trial, Buchanan has he has not established that counsel's failure to acquire this evidence prejudiced him under the *Strickland* standard.  *Strickland*, 466 U.S. at 687.

g. *Failure to Make an Adequate Record Regarding the Jury Seeing Buchanan in Shackles*

Buchanan contends counsel rendered ineffective assistance by failing to make a sufficient record to support his contention that the jury saw Buchanan in shackles during his transport to and from the courtroom. (Attach. C at 31, ECF No. 40-1; Lodgment No. 34, vol. 10 at 1214-15.) Buchanan claims counsel "failed to effectively address [the] fact [that the] jury viewed Petitioner shackled/crosscuffed [and] under escort by four armed deputy sheriffs in uniform." (*Id.*) Buchanan does not specify what precisely he claims counsel should have done. Because it is unclear whether this claim is procedurally defaulted, the Court will analyze this claim de novo. *Pirtle*, 313 F.3d at 1167.

As previously noted, there was an allegation that a juror saw Buchanan and Parraz in shackles, cross-cuffed and escorted by sheriffs while being transported to the courtroom. (*See* Lodgment No. 34, vol. 10 at 1214.) This claim was contradicted by the bailiff who said no jurors saw Buchanan and Parraz. (*Id.* at 1215.) The trial judge stated he would speak to all of the security personnel to determine whether the incident had occurred and, if it did occur, what to do to insure it did not happen again. (*Id.* at 1215.) The judge said he did not "want to say anything and bring it to anyone's attention" at that point. (*Id.*) No further discussions were had about the incident.

Buchanan has not shown counsel was ineffective, or that he was prejudiced by counsel's inaction. First, a reasonably competent attorney could have concluded that questioning the jury or bringing any further focus on Buchanan's restraints would have had a more prejudicial effect on the jury than not discussing the incident at all. *See Harrington*, 131 S. Ct. at 788 (stating that "the question is not whether counsel's actions were reasonable, [but] whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard"). Second, there is no solid evidence that any juror actually saw Buchanan in shackles, cross-cuffed and escorted by sheriff's deputies. While Parraz's attorney told the court that Parraz told her a juror had seen him and Buchanan in shackles, the bailiff told the judge there were no jurors who saw Parraz and Buchanan. In absence of definitive evidence that a member of the jury saw Buchanan in shackles, he cannot establish he was prejudiced under *Strickland*. *Strickland*, 466 U.S. at 687.

h. *Failure to Obtain Buchanan's Gang Validation Packet*

Buchanan claims counsel should have obtained his CDCR gang validation packet. (Attach. C

at 31, ECF No. 40-1.)  Had counsel done so, Buchanan contends, counsel could have more effectively challenged the prosecution's contention that he was a member of the Mexican Mafia, eliminated the gang expert's testimony and established for the jury the lack of due process in the gang validation process.  (*Id.*)  Because it is unclear whether this claim is procedurally defaulted, the Court will analyze this claim de novo.  *Pirtle*, 313 F.3d at 1167.

Buchanan does not specify what was contained in his gang validation packet and how counsel could have used it to challenge the gang expert's testimony that he is a member of the Mexican Mafia. It is difficult for this Court to imagine, and Buchanan does not explain, how evidence of Buchanan's CDCR gang validation as a Mexican Mafia member could have helped counter the prosecution's case. Nor does Buchanan explain how the gang validation packet would have prevented the prosecution from presenting the gang experts' testimony on the existence and structure of the Mexican Mafia.  The prosecution was certainly entitled to present the gang experts' testimony in order to prove the gang allegations.  Absent this, the Court cannot conclude counsel's failure to obtain the gang validation packet was an error "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.  Finally, it is not clear to this Court, and Buchanan does not explain, how the lack of due process protections in the CDCR gang validation process would have helped to disprove the crimes of which he was accused and thus affected the outcome of his trial.  *Id.*  He is therefore not entitled to relief as to this claim.

i. *Failure to Secure the Services of a Spanish Language Expert*

Buchanan argues counsel was ineffective when he failed to secure Spanish language expert Esteban Hernandez, who was Brooks' Spanish language expert, to translate the wiretaps.  (Attach. C at 31-32, ECF 40-1.)  Hernandez, Buchanan states, found the "major problem" with the translations, which presumably refers to the previously discussed portions of phone call number 776 wherein Brooks refers to "the person her that . . . watches over the businesses I have here," and states that if Torres "doesn't behave, then it's like all right, he's fucked . . . ." (*Id.* at 32.)  Because it is unclear whether this claim is procedurally defaulted, the Court will analyze this claim de novo.  *Pirtle*, 313 F.3d at 1167.

As previously discussed, Buchanan has not  established he was prejudiced by counsel's failure to secure a Spanish language expert.  To the extent Buchanan is arguing that had counsel hired a Spanish

1   language expert he would have been able to secure the same changes to his transcript as suggested by

2   Brooks' translator, the changes would not have affected the outcome of his trial for the same reasons

3   discussed in section IV(B)(3)(d) of this R&R — other, unchallenged portions of the transcript conveyed

4   the same information as the challenged portions, and the changes Buchanan suggests would not have

5   affected the jury's perception of the information contained in the tapes.   To the extent Buchanan is

6   arguing that a Spanish language expert would have discovered other problems with the translations, his

7   claim is speculative.   He does not provide any evidence regarding what changes would have been made

8   to the translations.   Without such evidence, he has not established the outcome of his trial would have

9   been different absent counsel's alleged errors.   *Strickland*, 466 U.S. at 687.

10         j.   *Failure to Call Methamphetamine Expert, Matthew F. Carroll as A Witness*

11         Defense counsel called Dr. Greg A. Michel, M.D. to testify about the effect of methamphetamine

12   use on a person's perception of reality.   (Lodgment No. 35, vol. 11 at 1404-11.)   The testimony was

13   offered to impeach Torres' testimony about what occurred among him, Buchanan and Parraz and

14   counter the evidence supporting the kidnaping charge.   Specifically, counsel sought to portray Torres

15   as paranoid and delusional due to his excessive methamphetamine use and suggest that he misinterpreted

16   Buchanan's actions and intent.   Dr. Michel was specifically asked how an individual who used an "eight

17   ball" of methamphetamine a day (about three and a half grams), the amount Torres said he used, would

18   act.   (*Id.* at 1413.)   Dr. Michel testified that when such a person was under the influence of

19   methamphetamine, he or she would be "hyperactive, possibly have some mental confusion."   (*Id.* at

20   1414.)   He or she would also be suffering from sleep deprivation which could result in "varying degrees

21   of paranoia." (*Id.*)   Such an individual would likely also suffer from "visual perceptual distortions" and

22   might exhibit "paranoid symptomology." (*Id*. at 1417.)   Buchanan complains that counsel should have

23   called Dr. Matthew F. Carroll as a methamphetamine expert, either instead, or in addition to, Dr. Michel.

24   Dr. Carroll, according to Buchanan, would have testified that "use of an eight-ball (3 ½ grams) of

25   methamphetamine a day, for approximately three months, would probably result in one being

26   susceptible to paranoia and hallucinations."   (Attach. C at 32, ECF No. 40-1.)   Because it is unclear

27   whether this claim is procedurally defaulted, the Court will analyze this claim de novo.   *Pirtle*, 313 F.3d

28   at 1167.

1    Buchanan does not explain how Dr. Carroll's testimony would have differed from Dr. Michel's

2    testimony and how he was prejudiced as a result of counsel not introducing testimony from Dr. Carroll.

3    Absent this, the Court has no basis upon which to conclude that counsel was ineffective for failing to

4    call Dr. Carroll, or that Buchanan was prejudiced as a result of this failure.  *Strickland*, 466 U.S. at 687.

5         k.  *Failure to Ask Buchanan to Testify in His Own Defense*

6    Buchanan states counsel did not ask him to testify in his own defense.  (Attach. C at 32, ECF No.

7    40-1.)  Had counsel done so, Buchanan contends, he would have testified that the guns and drugs found

8    on his person did not belong to him, and counsel should have pursued this line of defense.  (*Id.* at 32-

9    33.)  Because it is unclear whether this claim is procedurally defaulted, the Court will analyze this claim

10   de novo.  *Pirtle*, 313 F.3d at 1167.

11   A criminal defendant has a fundamental constitutional right to testify on his or her own behalf.

12   *Rock v. Arkansas*, 483 U.S. 44, 49, 51 (1987).  "The right is personal, and 'may only be relinquished by

13   the defendant and the defendant's relinquishment of the right must be knowing and intentional.'"

14   *United States v. Pino-Noriega*, 189 F.3d 1089, 1094 (quoting *United States v. Joelson*, 7 F.3d 174, 177

15   (9th Cir. 1993)); *see also Duhaime v. Ducharme*, 200 F.3d 597, 600 (9th Cir. 2000) (finding that Ninth

16   Circuit "cases may be persuasive authority for purposes of determining whether a particular state court

17   decision is an 'unreasonable application' of Supreme Court law, and also may help us determine what

18   law is 'clearly established.'").  "The *Strickland* standard is applicable when a petitioner claims his

19   attorney was ineffective by denying him his constitutional right to testify."  *Matylinsky v. Budge*, 577

20   F.3d 1083, 1097 (9th Cir. 2009) (citing *Medley v. Runnels*, 506 F.3d 857, 861 (9th Cir. 2007)).

21   Buchanan's claim is the trial counsel did not "ask" him to testify in his own defense.  (Attach.

22   C at 32, ECF No. 40-1.)  Counsel has no obligation to ask a defendant to testify if, in his judgment, it

23   would not assist in the defense.  The decision whether to have a defendant testify is a tactical one,

24   afforded great deference under *Strickland*.  *Matylinsky*, 577 F.3d at 1097.  Here, counsel made a

25   reasonable, tactical decision not to call Buchanan as a witness to testify that the guns and drugs found

26   on him did not belong to him.  *See Harrington*, 131 S. Ct. at 788.  Counsel had succeeded in preventing

27   the jury from hearing of Buchanan's prior convictions, which were numerous and serious.  (*See*

28   Lodgment No. 24, vol. 5 at 0739-41.)  Had Buchanan testified, he would have been impeached with his

1   prior convictions.  Moreover, it was reasonable for counsel to determine that Buchanan's proposed

2   testimony — that Torres forced him to take the gun and drugs at gunpoint and threatened to kill him if

3   he did not take them — was not believable in light of the testimony of Officer Nunez and Detective

4   McIvor about where the gun and drugs were found.  (*See* Lodgment No. 12, Attach. F., Ex. 27

5   [declaration of Richard Buchanan in support of state habeas corpus petition].)  Officer Nunez testified

6   Buchanan was sitting in the driver's seat with his knees tightly clamped together which indicated to

7   Nunez he was hiding something there.  (Lodgment No. 33, vol. 9 at 984.)  Buchanan refused to stand

8   up and kept his knees pressed together as he fell out of the car.  (*Id.* at 985.)  Nunez later discovered a

9   gun in Buchanan's shorts.  (*Id.* at 989-90.)  Methamphetamine was found inside a blue fanny pack

10  Buchanan was wearing on his belt loop.  (*Id.* at 992, 1047.)  During the search of the car, McIvor found

11  a black shaving kit bag on the driver's side floor.  The bag contained a notebook, a digital gram scale

12  and more methamphetamine.  (*Id.* at 1045.)  The notebook contained a "pay/owe" sheet indicating

13  methamphetamine sales.  (*Id.* at 1052.)  Nunez's and McIvor's testimony also defeats Buchanan's claim

14  that he was prejudiced by counsel's failure to call him as a witness because he has not shown the result

15  of the proceeding would have been different had counsel called him as a witness.  *Strickland*, 466 U.S.

16  at 687.

17          Further, waiver of the right to testify may be implied from the record.  "A defendant is

18  'presumed to assent to his attorney's tactical decision not to have him testify.'"  *United States v. Pino-*

19  *Noriega*, 189 F.3d 1089, 1094 (citing *United States v. Edwards*, 897 F.3d 445, 447 (9th Cir. 1990) &

20  *United States v. Martinez*, 883 F.2d 750, 760 (9th Cir. 1989)).  "'[W]aiver of the right to testify may be

21  inferred from the defendant's conduct and is presumed from the defendant's failure to testify or notify

22  the court of his desire to do so.'"  *Id.* at 1095 (citing  *United States v. Joelson*, 7 F.3d 174, 177 (9th Cir.

23  1993)).  "'When a defendant remains 'silent in the face of his attorney's decision not to call him as a

24  witness,' he waives the right to testify."  *Id.* (citing *United States v. Nohara*, 3 F.3d 1239, 1244 (9th Cir.

25  1993)).  Here, there is no evidence in the record Buchanan protested his attorney's failure to call him

26  as a witness, or that he told the trial court he wanted to testify, but was being prevented from doing so

27  by his attorney.  Indeed, the only reference to Buchanan's desire to testify is in the sealed transcript of

28  Buchanan's second *Marsden* hearing.  There, Buchanan makes the same allegation as he does in this

petition. (Lodgment 29 at 319.) The judge advised Buchanan that the law did not permit counsel to prevent him from testifying. (*Id.*) Buchanan did not insist on testifying at that time. (*Id.*)

For all the foregoing reasons, the Court concludes counsel's decision not to call Buchanan as a witness was a reasonable, tactical decision under *Strickland*, and that, in any event, Buchanan has not established he was prejudiced by counsel's failure to do so. Moreover, the record supports a conclusion that Buchanan waived his right to testify in his own defense. He is not entitled to relief as to this claim.

   l. *Failure to Introduce Transcripts of Wiretaps of Voice Mail Messages from Torres to Chavez*

Buchanan argues counsel should have used wiretaps of voice mail messages Torres left for Chavez as impeachment evidence to establish Torres was mentally unstable. (Attach. C at 33, ECF No. 40-1.) Specifically, Buchanan complains counsel should have used and submitted into evidence tape numbers 1223 and 1225. (*See* Lodgment No. 21, vol. 1 at 0110-22.) Because it is unclear whether this claim is procedurally defaulted, the Court will analyze this claim de novo. *Pirtle*, 313 F.3d at 1167.

Tape number 1225 was played for the jury and was admitted into evidence. (*See* Lodgment No. 21, vol. 1 at 0014; Lodgment No. 30, vol. 6 at 536; Lodgment No. 31, vol. 7 at 706-07.) Buchanan is thus not entitled to relief as to that portion of his claim.

Tape number 1223 consists of voice mail messages Torres left on Chavez's telephone about two hours before Buchanan's car was pulled over with Torres inside. (Exhibit 21.) In the messages, Torres threatens Chavez with revealing their relationship to her employers as well as making other threatening statements:

   TRISTE [Recording]: Hey, call me at the house. I'm gonna be here for about ten (10) minutes. I need you to call me right away. Um . . . they got a hold of me again, so when they um . . .so, um . . . Shit! Um, give me a call within ten (10) minutes. Seriously, 'cause um . . . whatever kind of shit you got me into . . (ui) . . . give me a call right now. I'm not bullshitting. Bye.

                    . . . .

   TRISTE [Recording]: Hey, What the fuck did you hang so for . . . for so fast?

                    . . . .

   TRISTE [Recording]: Hey, I'm a give you fifteen (15) minutes to do it. I'm a call back. If you don't do it then um . . . you're whole world's gonna come crashing down, 'cause I'll just . . . let everything out. [Noises] You know who you are fucking with . . . losing everything. [Pause] Just do it for me. Do me that favor and then . . . I'll be at the house in like thirty (30) minutes. Haven 'em come pick. Tell 'em I don't care no more. All right? [Noises] Um . . . I'm a call you back in fifteen (15) minutes . . . and

1    if you don't answer, if you don't tell me, then I'll just do that. And it'll be even worse.
2    You're better off just having them get rid of me. Bye. [Pause] Love you. Bye. [Noise]

. . . .

3    TRISTE [Recording]: Hey. Um . . . Why don't you pick up your phone? Um,
4    shit. I know you ain't at the hospital, so . . . stop bull shitting. Answer your calls.
5    [Noises]

. . . .

6    TRISTE [Recording]: Hey. I hope you did what [Noises] I fucking asked you.
7    [Pause] I know you're at home already. You'd better answer your phone. [Noises]

8    . . . .

9    TRISTE [Recording]: Hey. My part is done, so do yours. [Noise]

10    . . . .

11    TRISTE [Recording]: Hey. You think mother fuckers are stupid? You went out
12    with Elsa, right? [Noise]

13    . . . .

14    TRISTE [Recording]: Answer your phone. You've got me fucked up.

15   (Lodgment No. 12, Attach. F, Ex. 21.)

16        During Torres' direct examination, the prosecutor questioned Torres about calling Chavez on

17   August 25, 2004, the date of the crimes, and Torres admitted he had called Chavez "10 to 12 times," and

18   was mad at her. (Lodgment No. 31, vol. 7 at 705-06.) The prosecutor then played tape number 1225

19   for the jury. On the tape, Torres is heard arguing with Chavez and demanding that she contact

20   Buchanan and Brooks and tell them Torres had disobeyed their orders so they could "smoke" (kill) him.

21   (*Id.* at 707.) The prosecutor also asked Torres, "Is it fair to say what you were saying to Ms. Chavez

22   was sort of representative of the kind of calls you had been making to her all day?," to which Torres

23   responded, "Yes." (*Id.*)

24        Buchanan has not established either prong of *Strickland*. Tape 1223 contained a reference to

25   Buchanan as "Big Homie Richie," by Torres. In addition, the prosecution's theory of the case was

26   corroborated by Torres' statement on tape 1223 that "Big Homie Richie just talked to me . . . to leave

27   you alone. They've been working on you for a while. . . ." (Lodgment No. 12, Attach. F, Ex. 21.)

28   Torres was thoroughly cross examined about his obsessive relationship with Chavez. Counsel

1   reasonably determined that any benefit from further highlighting Torres' obsession by introducing tape

2   number 1223 was outweighed by the negative impact the references to Buchanan as a "Big Homie" and

3   support for the prosecution's theory the tape contained.  *See Harrington*, 131 S. Ct. at 788.  Secondly,

4   Buchanan has not established he was prejudiced by counsel's failure to introduce tape number 1223.

5   Torres testified that he repeatedly called Chavez the day of the crimes and that the tone and content of

6   his calls were similar to those on tape number 1225 in which he threatened her.  He also testified that

7   he was mad at her, that he was in love with her, that he aggressively pursued the relationship with

8   Chavez and threatened to expose their relationship to her employers.  (Lodgment No. 31, vol. 7 at 695-

9   96.)  Thus, the jury already had the essential information contained in tape number 1223 before them,

10  and further evidence of these behaviors would not have changed the outcome of the trial.  *Strickland*,

11  466 U.S. at 687.  Accordingly, Buchanan has not established counsel was ineffective as to this claim.

12          m.  *Failure to Call a Stalking Expert*

13          In the same vein as the preceding claim, Buchanan contends counsel should have called an

14  expert on stalking and should also have contacted Chavez's neighbors, housekeeper and babysitter to

15  obtain impeachment evidence on Torres' mental instability.  (Attach. C at 33, ECF No. 40-1.)  Because

16  it is unclear whether this claim is procedurally defaulted, the Court will analyze this claim de novo.

17  *Pirtle*, 313 F.3d at 1167.

18          As discussed above, Torres' placement in the EOP program in prison, his obsessive pursuit of

19  Chavez, his threatening and violent behavior toward Chavez, including his alleged rape of her, were all

20  placed before the jury.  There is no likelihood that the result of the proceeding would have been different

21  had counsel called a stalking expert.  *Strickland*, 466 at 687.  Accordingly, Buchanan is not entitled to

22  relief.

23          n.  *Cumulative Ineffective Assistance of Counsel*

24          Buchanan argues the cumulative effect of counsel's errors at trial denied his Sixth Amendment

25  right to effective assistance of counsel.  (Attach. C at 33-35, ECF No. 40-1.)  "Cumulative error applies

26  where, although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal,

27  the cumulative effect of multiple errors has still prejudiced a defendant."  *Jackson*, 513 F.3d at 1085

28  (quoting *Whelchel*, 232 F.3d at 1212)).  Because it is unclear whether this claim is procedurally

1    defaulted, the Court will analyze this claim de novo.  *Pirtle*, 313 F.3d at 1167.

2        The Court has determined there is no merit to Buchanan's individual ineffective assistance of

3    counsel claims; consequently, there is no basis for the Court to conclude the cumulative effect of

4    counsel's errors amounted to ineffective assistance.  Accordingly, Buchanan is not entitled to relief as

5    to this claim.

6        11.   *Ineffective Assistance of Appellate Counsel (Claim Ten)*

7        Next, Buchanan contends appellate counsel was ineffective for failing to raise claims one

8    through seven and ground eleven of this Petition in state court.  (Pet. at 15, ECF No. 40; Attach. C at

9    36-37, ECF No. 40-1; Traverse at 27-32, ECF No. 77.)  Respondent does not argue this claim is

10   procedurally defaulted and notes the California Court of Appeal expressly adopted the reasoning of the

11   superior court's analysis of the claims.  (Answer at 19-20, ECF No. 51.)

12        Buchanan raised his ineffective assistance of appellate counsel claim in the petition for review

13   of his state habeas corpus petition he filed in the state supreme court.  The California Supreme Court

14   denied the petition without citation of authority.  (Lodgment No. 20.)  This Court will "look through"

15   to the last reasoned state court opinion addressing this claim which is the state appellate court's opinion

16   denying Buchanan's habeas corpus petition.  *Ylst*, 501 U.S. at 805-06.  The appellate court stated that,

17   with regard to Buchanan's claim that appellate counsel was ineffective for failing to raise the claims he

18   raised in his state habeas corpus petition,  it "adopt[ed] the analysis of the superior court's December

19   31, 2009, order denying relief on the merits," and that "because petitioner's contentions fail on the

20   merits, he cannot show that 'but for' counsel's failure to raise the issues the result of his appeal would

21   have been different.  (*Smith v. Robbins* (2000) 528 U.S. 259, 285.)."  (Lodgment No. 12 at 2.)

22        The state superior court found as follows: (1) the police had sufficient reasonable suspicion

23   under the Fourth Amendment to stop Buchanan's car because they believed the individual in passenger

24   seat was a parolee at large and because they believed the passenger was in danger; (2) the prosecution

25   did not withhold Torres' prison mental health records because they were not in possession of the records

26   and Buchanan could have subpoenaed them; (3) the prosecution did not falsify evidence or present false

27   evidence by introducing the Spanish translations of the wiretapped phone calls that Buchanan alleges

28   contain inaccurate translations, and, in any event, Buchanan had not established he was prejudiced by

any errors in the translations because the changes to the transcripts would not have led to a different outcome; (4) Buchanan did not present sufficient evidence to support his claim that the prosecution relied on false evidence in the form of testimony by Detective McIvor that he was unable to identify the "Triste" referred to in the wiretapped phone conversations and that he lied about the reason for the stop of Buchanan's car, and, in any event, Buchanan had not established he was prejudiced by such statements; (5) Buchanan had not established the prosecutor had committed misconduct by suppressing audio and video recordings, lying about when certain discovery was turned over to the defense and implying that he would call a Spanish language expert to verify the translations of the wiretaps because the claims were based on insufficient evidence or speculation and Buchanan had not established he was prejudiced by any error; (6) Buchanan had not established law enforcement coerced or intimidated witnesses because he had presented only speculation to support the claims; (7) Buchanan had failed to establish that using the cell phone given to him as part of the investigation as evidence against him violated his due process rights, essentially an entrapment defense, because law enforcement did not induce him to commit the crimes; (8) Buchanan had failed to establish the trial court imposed excessive security or that he was prejudiced when by the jury seeing him in shackles because there was sufficient evidence to support the security and he had failed to establish he was actually prejudiced by any juror's view of him in shackles; and (9) Buchanan had failed to establish that trial counsel was ineffective because he had not established that he was prejudiced by any of the errors he alleged counsel had committed, including counsel's failure to obtain Buchanan's CDCR gang validation packet, counsel's failure to call an methamphetamine expert to testify as to the effects Torres' methamphetamine use would have had on his mental stability, failure to call a Spanish language expert to testify as to the errors in the translations in the wiretaps, failure to challenge law enforcement's use of the cell phone given to him by law enforcement as evidence of his guilt, failure to call a stalking expert, and failure to play wiretap number 1223 for the jury.  (Lodgment No. 11 at 8-23.)

"The proper standard for evaluating [a] claim that appellate counsel was ineffective . . . is that enunciated in *Strickland*."  *Smith v. Robbins*, 528 U.S. 259, 285 (2000) (citing *Smith v. Murray*, 477 U.S. 527, 535-36 (1986)).  To establish prejudice in the context of ineffective assistance of appellate counsel, Buchanan must have shown in state court a reasonable probability that he would have prevailed on

1    appeal absent counsel's errors.  *Smith*, 528 U.S. at 285 (citing *Strickland*, 466 U.S. at 694).  As with

2    ineffective assistance of trial counsel claims, "[t]he performance component need not be addressed first

3    '[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which

4    we expect will often be so, that course should be followed.'"  *Id.*, n. 14 (quoting *Strickland*, 466 U.S.

5    at 697).

6         The state court's denial of Buchanan's claim of ineffective assistance of appellate counsel was

7    neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.

8    *Williams*, 529 U.S. at 412-13.  As discussed in sections IV(B)(3), (5)-(8), (10) and (12) of this R&R,

9    there is no merit to Buchanan's claims that the prosecutor used false and perjured testimony to secure

10   the convictions and withheld exculpatory evidence, the judge was biased against him, there was

11   excessive security at trial, he was improperly shackled, the prosecutor committed misconduct, trial

12   counsel was ineffective and the $10,000 restitution fine was excessive.  (*See* R&R, Sections IV(B)(3),

13   (5)-(8), (10), (12).)  Thus, there is no reasonable probability that Buchanan would have prevailed on

14   those claims if counsel had raised them on appeal.  *Smith*, 428 U.S. at 285.

15        Regarding Buchanan's claim that the his Fourth Amendment rights were violated by the search

16   and seizure of his car and person, the Court agrees with the state court's analysis of this claim.  As both

17   the state court and this Court noted in section IV(B)(6)(i) of this R&R, the sole question before the trial

18   court was whether there was probable cause to stop Buchanan's car.  "[A]n officer's subjective thoughts

19   play no role in the Fourth Amendment analysis."  *Whren*, 517 U.S. at 811-12.  The perceived threat to

20   Triste's life heard by law enforcement on the wiretap was sufficient cause under the Fourth Amendment

21   to stop Buchanan's car.  There is no reasonable probability he would have prevailed on this issue had

22   counsel raised it on appeal.  *Smith*, 528 U.S. at 285.  Accordingly, the state court's denial of the claim

23   was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.

24   *Williams*, 529 U.S. at 412-13.

25   / / /

26   / / /

27   / / /

28   / / /

12.     *Erroneous Imposition of a $10,000 Restitution Fine (Claim Eleven)*

Finally, Buchanan claims the trial court improperly imposed a $10,000 restitution fine.  (Pet. at 16, ECF No. 40; Attach. C at 39-40, ECF No. 40-1; Traverse at 26-27, ECF No. 77.)[13]  Respondent contends this claim is procedurally defaulted.  (Answer at 6-7, ECF No. 51; Mem. of P. & A. Supp. Answer at 12-18, ECF No. 51-1.)  Because it is unclear whether this claim is procedurally defaulted, the Court will analyze this claim de novo.  *Pirtle*, 313 F.3d at 1167.

"The Eighth Amendment provides that '[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.'  U.S. CONST. amend. VIII."  *Norris v. Morgan*, 622 F.3d 1276, 1285 (9th Cir. 2010).  To establish an Eighth Amendment violation, a fine must be "'grossly disproportional to the gravity of a defendant's offense.'"  *United States v. Mackby*, 339 F.3d 1013, 1016 (9th Cir. 2003) (citing *United States v. Bajakajian*, 524 U.S. 321, 334 (1998) (applying the Eighth Amendment's excessive fines clause to punitive forfeitures)).  Given that Buchanan was convicted of committing serious and violent crimes for the benefit of a criminal street gang, the $10,000 fine imposed by the state court was not so grossly disproportionate to his offenses, that it violates the Eighth Amendment.  He is not entitled to relief as to this claim.

## IV.     **CONCLUSION**

The Court submits this Report and Recommendation to United States District Judge Barry Ted Moskowitz under 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.1(d)(4) of the United States District Court for the Southern District of California. For the reasons outlined above, IT IS HEREBY RECOMMENDED that the Court issue an order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered **DENYING** the request for an evidentiary hearing and **DENYING** Petition for Writ of Habeas Corpus.

IT IS ORDERED that no later than **October 28, 2011** any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

IT IS FURTHER ORDERED that any reply to the objections shall be filed with the Court and

---

[13]  To the extent Buchanan is challenging the application of state law, he is not entitled to relief.  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (holding that federal habeas relief is not available for alleged violations of state law); see also 28 U.S.C. § 2254(a).

served on all parties no later than **November 11, 2011**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th Cir. 1991).

**IT IS SO ORDERED.**

DATED:  September 30, 2011

Hon. Nita L. Stormes
U.S. Magistrate Judge
United States District Court